-

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

EARLEEN FAUVERGUE, )
)
For Herself and As Representative of a Class of )
Similarly Situated Persons, )
)
Plaintiffs, )
) No. 08-431
vs. )
)
THE UNITED STATES OF AMERICA, )
)
Defendant. )
)

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO CERTIFY CLASS ACTION**

## I. SUMMARY OF MOTION

Earleen Fauvergue owns fee title to real estate located in Jasper County, Missouri. Ms. Fauvergue's property was once subject to an easement for a railroad held by the Burlington Northern and Santa Fe Railway ("BNSF"). This now abandoned railroad line was a 28.25 mile long corridor that was originally constructed by the Memphis, Carthage and Northwestern Railroad Company ("MCNRC") for operation of a railroad between Columbus, in Cherokee County, Kansas and Carthage, in Jasper County, Missouri. The MCNRC acquired the right to construct a railroad line across this land by virtue of easements that gave the railroad the right to use the property for a railroad right of way in 1876. Portions of the railroad right of way were easements granted by a condemnation decree entered by the Jasper County Circuit Court.

Under the terms of the condemnation decree and under Missouri and Kansas law, once the successor to the MCNRC (which is now BNSF) ceased operating a railroad across the right-of-way, the railroad easement was abandoned and BNSF's right to use



STLDOCS 218512v2

Plaintiff's (and similarly situated land owners') property ceased. Moreover, even if BNSF had not abandoned the property, BNSF's right to use the property for a railroad never included the right to use the property for a public-access recreational trail. The STB's issuance of the NITU takes the Plaintiff's "reversionary" right to their land – rights to which they are otherwise entitled under Missouri and Kansas law. *Caldwell v. United States*, 391 F.3d 1226 (Fed.Cir. 2004); *Barclay v. United States*, 443 F.3d 1368 (Fed.Cir. 2006); *Renewal Body Works v. United States*, 443 F.3d 1368 (Fed.Cir. 2006); *Towes v. United States*, 376 F.3d 1371 (Fed.Cir. 2004); *Hash v. United States*, 403 F.3d 1308 (Fed.Cir. 2005).

Plaintiffs seek compensation for this taking of their property which, but for operation of the Trails Act, would have been theirs to use and occupy. Plaintiff's claim for an uncompensated taking of her land is brought against the United States Government under the Tucker Act[1] and the Fifth Amendment to the United States Constitution because the taking of her property occurred by reason of the federal Trails Act. See, *Preseault v. United States*, 494 U.S. 1 (1990) and *Preseault v. United States*, 100 F.3d 1525 (Fed.Cir. 1996).

Plaintiff also seeks to certify this claim as a class action with herself as a representative party for that class of similarly situated individuals or entities that held fee title to any land in Jasper County, Missouri or Cherokee County, Kansas, which is or was encumbered by the reason of the Trails Act and the June 21, 2002 NITU.

Because common questions of fact and law are shared by all property owners whose land is or was subject to this NITU, certification as a class action under Rule 23 of

[1] 28 U.S.C. § 1491(a)(1).

the Rules of the United States Court of Federal Claims ("RCFC") serves the interests of justice, judicial economy, and efficiency. Certification of this matter as a class action also satisfies each of the specific criteria established by the U.S. Court of Claims in its benchmark decision, *Quinault Allottee Association and Individual Allottees v. United States*, 453 F.2d 1272 (Cl. Ct. 1972).

Class certification has been granted in the similar Trails Act cases such as *Rogers v. U.S.* (No. 07-273); *Hubbert v. U.S.* (No. 99-396L); *Illig v. U.S.* (No. 98-934L); *Moore v. U.S.* (No. 93-134L); and *Glosemeyer v. U.S.* (No. 93-126L). Certification of Tucker Act takings claims brought by landowners whose property was taken by operation of the Trails Act as opt-in class actions pursuant to RCFC 23 has proven to be a substantially more cost-effective means to manage Trails Act taking claims.

Finally, the Uniform Relocation Assistance and Real Property Acquisition Policy Act of 1970, 42 U.S. C. § 4654 (c) (2000) requires the federal government to pay the legal fees and expenses of those property owners entitled to compensation for the taking of their property. The management of these claims as an opt-in class action pursuant to Rule 23 RCFC will very substantially reduce the costs and attorney fees paid by the federal government and provide for quicker more efficient resolution of these claims.

## II. STATEMENT OF QUESTION INVOLVED

Does Rule 23 RCFC allow for opt-in class certification of the claims by more than 75 owners of property in two adjacent counties who each have a similar Tucker Act claim under the Fifth Amendment for the federal government's taking of their property pursuant to the federal Trails Act when each landowners' claim arose by reason of the same NITU issued by the Surface Transportation Board?

## III. THIS CASE SHOULD BE CERTIFIED AS AN OPT-IN CLASS ACTION.

### A. THIS COURT HAS AUTHORITY TO CERTIFY A CLASS ACTION

Rule 23 of the Rules of United States Court of Federal Claims ("RCFC 23") gives this Court the authority to certify class actions. The rule states that "[a]s soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether [a class action] is to be so maintained."[2] In *Quinault Allottee Association and Individual Allottees v. United States*, the United States Court of Claims explained that "there is nothing in the type of jurisdiction we have ... to deprive us of this modern aid to speedier and less repetitious litigation." 453 F.2d 1272, 1274 (Cl. Ct. 1972).

### B. THIS ACTION FITS SQUARELY WITHIN THE COURT OF FEDERAL CLAIMS' GENERAL REQUIREMENTS FOR A PROPERLY CERTIFIED CLASS ACTION.

The Court of Federal Claims' revised Rule 23, in the main, adopts the criteria for certifying and maintaining a class action set forth in *Quinault*, the seminal case on class certification, which sets out various criteria to consider in deciding whether to certify a class. *Testwuide v. United States*, 56 Fed. Cl. 755, 761 (Fed. Cl. 2003). This Court must

[2] RCFC 23(c)(1).

generally consider the seven criteria set forth in *Quinault*.[3] *Favreau, II v. United States*, 48 Fed. Cl. 774, 776-777 (Fed. Cl. 2000). Additionally, the court should ask whether certification "would serve the interests of justice by addressing possible statute of limitations problems or other concerns." *Id.*

*1. This Case meets the criteria set forth in Quinault.*

The Court of Federal Claims has articulated the requirement that a class action case meet the seven *Quinault* criteria discussed below. *Favreau, II,* 48 Fed. Cl. at 776-777. "The *Quinault* test, however, is conjunctive; that is, failure to satisfy any one of the *Quinault* requirements is fatal to a motion for class certification." *Testwuide,* 56 Fed. Cl. at 761 (citing *Banner v. United States*, 38 Fed. Cl. 700, 703 (Fed. Cl. 1997)).

This present case completely satisfies all of the *Quinault* criteria (as spelled out in more detail in section C of this Memorandum): (1) the class size is expected to represent more than 75 class members, a large but manageable class; (2) the common questions of law focus upon whether the government took plaintiffs' private property for public purpose under the Trails Act and the Fifth Amendment of the United States Constitution. This question must be answered for all potential class members under common legal issues of Missouri and Kansas and federal law; (3) the factual questions will not override the common legal issues in that while no single parcel of real estate is precisely the same, property value differences are readily distinguished and determined by professional real

[3] The *Quinault* opinion set out an eighth factor—whether individual suits would create a risk for inconsistent adjudications. Given the Federal Circuit's appellate jurisdiction over Tucker Act and "little Tucker Act" decisions, the eighth factor is not applicable here. See *Christian, II v. United States*, 46 Fed. Cl. 793, 816 (2000) (*citing Berkley v. United States*, 45 Fed. Cl. 224, 234 (1999).

estate appraisers[4]; (4) the claim of the named Plaintiff is typical of class members since the burden of the taking fell on all fee owners on the common date of taking; (5) the government's actions affected all plaintiffs simultaneously, thereby acting on grounds applicable to the whole class; (6) based on reasonable estimations of Plaintiffs' counsel, damages for many of the fee owners will likely be of such limited amount (relative to the cost of presenting their claim) that separately litigating each fee owner's claim would be extremely inefficient and costly; and (7) similarly situated persons are suing under identical statutes and are represented by competent counsel with substantial experience in similar takings cases, thus, the named Plaintiff will adequately protect the interests of the class.

2. *Certification would serve the interests of justice.*

Certification in this case would serve the interests of justice. The class size, litigation efficiencies realized, and proposed "opt in" class are all attributes justifying class certification.

The proposed class represents more than 75 potential individual cases against the United States Government seeking compensation resulting from the taking of property that occurred when the STB issued a Notice of Interim Trail Use for the 28.25 mile long railroad right of way: Certification of a class action is the most efficient way to proceed. Instead of having more than 75 different cases, with multiple counsel and experts

---

[4] The Department of Justice and counsel for property owners have adopted a cost-efficient method for establishing the value of each individual parcel of property taken in other class action Trails Act taking cases and it is anticipated that a similar method could be adopted in this case. *See*, remarks of former Assistant Attorney General Sansonetti in Temiony before House Judiciary Committee in June, 2002, referencing in *Illig v. United States*.

assigned to different trial judges, there will be one Plaintiffs' counsel working with common experts before one judge. Additional efficiencies are gained through the use of common title research and a unified approach to the appraisal of property values. There will be only one action to resolve the common factual and legal questions. The most substantial benefit of class certification is enjoyed by the Government since class certification provides an efficient method for the class members to present their claims and for the Government to answer those claims and resolve legitimate claims in a cost-efficient manner with limited attorney fees and expenses.

Federal law provides that where the plaintiff is successful in its action, the Government is required to pay the plaintiff's attorneys' fees and costs.[5] The attorneys' fees, costs, expert witness and appraisal fees for more than 75 separate actions, would greatly exceed the expense for one combined class action. The certification of this case as a class action, therefore, benefits the Government by reducing the potential amount of the Government's liability for Plaintiffs' attorney's fees and other costs.

The Plaintiff proposes an "opt-in" class which is the only type of class action that this Court will certify.[6] Certification of an "opt in" class means that potential members will not be included unless they take affirmative steps to join the suit after receiving notice. Plaintiff and her counsel bear the burden (and the initial expense) of notifying the potential class members. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). The

---

[5] *See* 28 U.S.C. § 2412.

[6] *See* Rules Committee Note to RCFC 23: "Additionally, unlike the federal rule, the court's rule contemplates only opt-in class certifications, not opt-out classes. The latter were viewed as inappropriate here because of the need for specificity in money judgments against the United States, and the fact that the court's injunctive powers—the typical focus of an opt-out class—are more limited than those of a district court."

Court of Federal Claims has indicated its disfavor of "opt-out" classes in which potential class members are automatically included unless they take action to remove themselves as participants in the suit. *Armitage v. United States*, 18 Cl. Ct. 310, 312 (Cl. Ct. 1989); *Quinault*, 453 F.2d at 1276-1277.

Likewise, class certification would serve to eliminate any potential problems raised by the impeding statute of limitations. The NITU in this case was issued on June 21, 2002. Under *Caldwell*, the six year statute of limitations for filing a Trails Act takings claim begins to accrue on this date. Thus, all claims for compensation arising out of the June 21, 2002 NITU must be filed by June 21, 2008. *Caldwell v. United States*, 391 F.3d 1226 (Fed.Cir. 2004); *Barclay v. United States*, 443 F.3d 1368 (Fed.Cir. 2006); *Renewal Body Works v. United States*, 443 F.3d 1368 (Fed.Cir. 2006). Because that date is less than ten days from the filing of this Memorandum, Plaintiff anticipates that there may not be any other claims made for compensation before the statute of limitations has ended. Therefore, Plaintiff seeks to certify this claim as a class action to ensure that any interested parties with claims for compensation in either Kansas or Missouri are eligible to receive "just compensation" for the federal government's taking of their land.

For the foregoing reasons, the interests of justice are served because the interests of judicial economy and efficiency are served. Consequently, certification of the class is warranted.

### C. THIS ACTION SATISFIES EACH OF THE SPECIFIC *QUINAULT* CRITERIA FOR CERTIFICATION OF A CLASS ACTION.

The Court of Federal Claims Rule 23 (RCFC 23) is largely modeled on the comparable Federal Rule of Civil Procedure 23. In the main, the court's rule adopts the

criteria for certifying and maintaining a class action as set forth in *Quinault*. Plaintiff notes that this action satisfies all of the *Quinault* criteria required to be considered in determining whether certification of a particular class action is appropriate. 453 F.2d at 1276. The eight criteria are as follows:

> **(i) [the members must] constitute a large but manageable class, (ii) there is a question of law common to the whole class, (iii) this common legal issue is a predominant one, overriding any separate factual issues affecting individual class members, (iv) the claims of the present plaintiffs are typical of the claims of the class, (v) the Government has acted on grounds generally applicable to the whole class, (vi) the claims [of the class members] are so small that it is doubtful that they would be pursued other than through this case, (vii) the current plaintiffs will fairly and adequately protect the interests of the class without conflict of interest, and (viii) the prosecution of individual actions by members of the class, some in district courts and some in this court, would create a risk of inconsistent or varying adjudications. *Id.***

Despite the foregoing, the *Quinault* court declined to articulate a general rule of standards for certifying class actions and suggested proceeding on a case by case basis. *Glosemeyer*, 45 Fed. Cl. at 230 citing *Quinault*. Additionally, the eighth criterion concerning inconsistent adjudications no longer applies in takings cases.[7] *Moore*, 41 Fed. Cl. at 400.

The decision in *Quinault* stands as the "seminal case in this court regarding class certification." *Testwuide*, 56 Fed. Cl. at 761.[8] Plaintiff meets all of the *Quinault* criteria

[7] This is so because the Court of Appeals for the Federal Circuit "now hears appeals from both the district courts and this court in cases seeking compensation for a taking." *Moore v. United States*, 41 Fed. Cl. 394, 400. *See* 28 U.S.C. § 1295 (1994).

[8] *See also Favreau, II v. United States*, 48 Fed. Cl. 774, 776.

and thus, her Motion to Certify a Class should be granted. We consider each criterion *seriatim* below.

1. *The Proposed Members Constitute a Large But Manageable Class.*

The court is given "wide discretion to determine on a case by case basis if the numerosity requirement is met." *Favreau, II*, 48 Fed. Cl. at 777; *Taylor v. United States*, 41 Fed. Cl. 440, 445 (Fed. Cl. 1998).

"In deciding whether a proposed class is manageable, the court considers whether the members are readily identifiable and reachable." *Id.*

**a)** Plaintiff's proposed class satisfies the "large" size criterion.

There is no definite rule as to how large a class must be to qualify for certification, but prior cases in this Court have implied that a proposed class size of fifty members or less was too small. *Saunooke v. United States*, 8 Cl. Ct. 327, 333 (Cl. Ct. 1985). The present proposed class size which likely exceeds seventy-five or more members is considerable and based upon a sound estimate of an ascertainable number of class members. *See Evans v. United States Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983) (showing of precise numbers is not required, but mere allegations of numerosity are inadequate) and *Waller v. International Harvester Co.*, 98 F.R.D. 560, 563 (N.D.Ill. 1983) (numerosity requirement not satisfied where class size is purely speculative). Since the proposed class will be made up of those fee landowners who owned parcels of property along the Cherokee County, Kansas to Jasper County, Missouri right of way as of the June 21, 2002 NITU date, prospective class members can be identified by a search of the records of the Jasper and Cherokee Counties Tax

Assessors and Recorder of Deeds. The Plaintiff estimates that there are significantly more than 75 individuals or entities who own fee parcels along the right of way that have not been compensated or otherwise made a claim for compensation. Some individuals may own more than one parcel.

**b)** The proposed class is also manageable as required by the *Quinault* criteria.

The Court has required that the class be manageable. By "manageable," the Court "considers whether the members are identifiable and reachable." *Favreau, II*, 48 Fed. Cl. at 777. And in *Hannon v. United States*, the court concluded that plaintiffs met the manageability prong because "[p]laintiffs' counsel has assured that each of the ... plaintiffs could be reached in order to be notified of the pending suit... ." *Hannon v. United States*, 31 Fed. Cl. 98, 103 (Fed. Cl. 1994). This notification could easily be achieved for the proposed class in this case. As mentioned above, the entire class in this case is ascertainable through a search of the records of the Jasper and Cherokee Counties Tax Assessors and the Recorders of Deeds. The search can retrieve the names and addresses of all those individuals or entities shown to be fee owners of property along the right of way on the June 21, 2002 NITU date. Plaintiff's counsel has already undertaken the initial research to identify the number and identity of potential class members.

In prior class certified Trails Act cases this Court required that notice of the lawsuit shall be sent by first class mail to all fee owners of the land who held title on the date of taking and published in the local community newspaper and other community publications. This publication is calculated to reach a broad circulation of the community and local landowners. A similar class notification procedure was agreed to by Plaintiff's

counsel and Justice Department and ordered by this Court in *Illig v. United States*, *Miller v. United States*, and *Rogers v. United States*. The Plaintiff anticipates a similar procedure in this case.

The great body of facts common to each landowner's claim further enhances the manageability of this proposed class. As stated, all of the proposed class members own land along the same 25.28 mile stretch of land between Cherokee County, Kansas and Jasper County, Missouri with each county having a common Recorder of Deeds which maintains title and land records for all parcels. But the pivotal issue determining manageability concerns the ownership of the land when BNSF's predecessor, the Memphis, Carthage and Northwestern Railroad Company, first built the railroad along the property. This common derivation of ownership of the land factually unites the current landowners and creates a class in which most class members share common factual and legal title issues. *Hannon*, 31 Fed. Cl. at 101-103 (factual similarities made class more manageable). The railroad right of way was established, in part, by a single condemnation decree. The proposed class is not overly large and is manageable. The first prong of *Quinault* is satisfied.

2. *The Claims of All Potential Class Members Turn On Legal Issues Common to the Entire Proposed Class.*

*Quinault's* second criterion requires that there exist common questions of law for the entire class. The principal legal issue in this case is whether the June 21, 2002 Notice of Interim Trail Use authorizing conversion of the 28.25 mile long abandoned right of way to trail use, constitutes a taking under the Fifth Amendment of the United States Constitution. Two specific legal questions flow from this overarching question: (1) what

interest in the property did the railroad hold under Missouri and Kansas law when the easement was created? (2) Did the STB's issuing a NITU pursuant to the Trails Act take the Plaintiffs' right to use their land? Both queries are answered by two events common to all fee owners.

The first question is answered by the terms of the easement or condemnation decree under which the railroad acquired the right to use the property when the right of way was built in the late 1800s. Whatever right BNSF had to use the fee owners' property in 2002 is determined by the interest acquired by the Memphis, Carthage and Northwestern Railroad Company under Kansas and Missouri law.

The second question concerns the legal effect of the STB's issuance of a NITU. See, *Caldwell v. U.S.* 391 F.3d 1226 (2004), *Barclay v. U.S.* 443 F. 3d 1368 (2006). These central questions of law and fact are common to all members of the proposed class.

The property interests for which potential class members seek compensation are defined by Kansas and Missouri property law.[9] The Fifth Amendment to the Constitution of the United States requires the payment of "just compensation" for the taking of private property for public use.

---

[9] Justice O'Connor in *Presault v. Interstate Commerce Commission*, 494 U.S. 1 (1990) wrote: "As the [majority opinion] acknowledges, state law creates and defines the scope of the reversionary or other real property interests affected by the ICC's actions. In determining whether a taking has occurred, [we make] reference to state law…to determine whether a railroad right of way lapsed upon the conversion to trail use." [citations omitted]. 494 U.S. at 20.

When applying a state's statute, this Court is bound to accept the construction placed on the statute by the state's highest court. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 381 (1992); *Medical Protective Co. v. Bell*, 912 F.2d 244, 245 (8th Cir. 1990), *cert. denied*, 498 U.S. 1090 (1991).

The common question of Kansas and Missouri law is whether under the terms of the conveyance documents that created the easement, MCNRC held a right to use the property for a public access hiking and biking trail.

The interest acquired by the MCNRC railroad in 1876 when the right of way established was expressly limited to a right to use the property for the operation of a railroad. The landowners retained fee title. For this reason, all landowners are united by a common legal issue because, even if the railroad held the greatest possible interest in the property short of actual fee ownership, the railroad did not, under Kansas and Missouri law or under the terms of the conveyances or condemnation decrees, acquire the right, nor have the ability to grant or convey an easement for a public access recreation trail. This single legal issues is common to all members.

In *Caldwell*, *Barclay*, and *Renewal*, the Federal Circuit held that a Trails Act "taking" occurrs upon the STB's issuance of a Notice of Interim Trail Use. The NITU "takes" the property owners' "reversionary interests" in their property. Therefore, both the state and federal issues are common to the entire proposed class and the second prong of the *Quinault* criteria is satisfied.

*3. The Common Legal Questions Predominate and Override Any Separate Factual Issues Affecting the Individual Members.*

As noted *supra*, the legal issues necessary to resolve these questions are identical for all class members. Furthermore, these issues of Kansas and Missouri real property law and the Trails Act dominate this case and override separate factual issues.

a.) <u>The proposed class members share common factual issues of title and, where these factual issues are unique, they are not significant.</u>

Because the original grantors of the land were common and limited in number, there are few factual differences among class members. For instance, much of the Missouri portion of the rail line was constructed pursuant to a single condemnation decree by the Jasper County Circuit Court. For this condemnation decree as well as the other easement that conveyed the right of way to the railroad, so long as the railroad did not hold actual fee title, Kansas and Missouri law provide the same legal answer: the railroad's interest is only an easement and this easement is extinguished when operation of the railroad over the property is abandoned.

The subsequent conveyances (from the original property owners who held title when the railroad was built in the late 1800's up to the present fee owners) would concern essentially irrelevant factual differences between class members. The chain of title for many of the property owners would trace back to a common original fee owner who granted the railroad easement. However, as long as each class member can establish his or her own fee ownership of the land on the June 21, 2002 date of the NITU, these *mesne* transactions would not be at issue in a resolution of the Government's liability for the taking.

b.) Despite having claims of differing monetary amounts, the potential class members share common factual issues to establish such property valuation.

The primary factual difference among the proposed class of fee owners concerns the extent of damages that each class member is entitled to recover for the value of his or her portion of the right of way. Because each parcel is unique in size, this amount will necessarily vary among the class members.

Once the liability phase has been completed, the determination of damages for separate plaintiffs does not prevent class certification. This court has held that class action status should not be ruled out if liability has been established "and quantification of the amount of each plaintiff's damages remains the sole issue… ." *Hannon*, 31 Fed. Cl. at 103. The holding is directly on point in this case because the precise dollar amount of each class member's recovery will differ depending on the size of the taking and the severance damages. The *Hannon* court explained further that differing facts concerning damages did not prevent class certification because "[i]n all likelihood, such damages could be computed mechanically." *Id.* Such a mechanical determination of damages could be applied to this case, as discussed in *Hannon*. Using the property valuation approach agreed to by the Justice Department and Plaintiff's counsel in other Trails Act cases that use a formula to assist in determining efficiently and fairly the amount of compensation for each class member based upon the location of the property and the amount of acreage affected. The character of much of the property is similar, with more of the potential class members having a claim for property in residential neighborhoods many of these properties share factors common to the appraisal of the value of each property.

While discussing the possibility of allowing joinder of 1,218 plaintiffs, for example, the court in *Abel v. United States*, 18 Cl. Ct. 477 (Cl. Ct. 1989), remarked that it "has never expressed any concern nor had any difficulty dealing with cases involving hundreds of party plaintiffs… ." 18 Cl. Ct. at 479 (quoting *O'Hanlon v. United States*, 7 Cl. Ct. 204, 206-207 (Cl. Ct. 2004)). By this statement, the court implicitly recognized that the determination of damages for the various class members should not render a class

action unworkable. Thus, the differing damages between the class members is, in a sense, expected and does not override the common legal issues.

Because there are few factual differences in each class member's case and because the differences that exist go to facts which do not prevent class certification, the common legal issues predominate and override those insignificant differences. Plaintiffs, therefore, have satisfied the third prong of the *Quinault* criteria.

Further, in other takings cases under the Trails Act, in which Plaintiffs' counsel represented the property owners (*Illig v. United States* and *Miller v. United States*) an efficient method to value each class members' property was developed by agreement between Plaintiff's counsel and the Justice Department. The parties selected representative parcels for certain general classes and agreed to use the designated parcels as a proxy to establish a value that could be applied to other like parcels (e.g., similar sized residential parcels in the same neighborhood). This meant that not every parcel needed to be separately appraised. This was a substantial savings of time and money. Plaintiff's counsel believes that a similar valuation approach would be appropriate in this case.

4. *The Claims of the Named Plaintiffs Are Typical of the Claims of the Class.*

*Quinault* requires that the claims of a named Plaintiff be typical of the claims of the potential class. This criterion is satisfied by the common factual and legal issues noted *supra*.

The Court of Federal Claims has not provided extensive guidance concerning what factors contribute to the analysis of this criterion. In *Hannon*, however, the court

held that because the named Plaintiffs had causes of action under the same statutes as the class members, this criterion was satisfied. 31 Fed. Cl. at 104. *Hannon* also applies in this case where the named Plaintiff and all of the potential class members are bringing claims premised upon a common legal theory of recovery under Kansas and Missouri real property law and by operation of the Trails Act which worked a taking of their property.

Further, this case concerns the STB's issuance of a single NITU that applied to all claims. The factual similarities between the named Plaintiff and the proposed class members also indicate that this criterion is satisfied. Each of these Plaintiffs, named and unnamed, owns fee simple title to land along right of way in issue. Because the single named Plaintiff is bringing a cause of action, for herself individually and as representative of the proposed class, based on a single legal theory, the criterion of typicality—that the named Plaintiff's claims be typical of the claims of the potential class—is satisfied.

5. *The Government Has Acted on Grounds Applicable to the Whole Class; When the federal STB issued the June 21, 2002 NITU, the Government Took the Property of Each Class Member Simultaneously and in the Same Manner.*

The enactment of the Trails Act by Congress and its specific application to the particular real estate underlying this right of way, was triggered on June 21, 2002 when the STB issued the NITU. This Government action is applicable to and had a common effect upon the entire class.

According to *Armitage*, the key to this criterion is that the Government action cannot "implicate matters unique" to an individual plaintiff in the liability phase. 18 Cl. Ct. at 313. *Hannon* concluded that this criterion was met when the Government action

had the same general impact upon the class. 31 Fed. Cl. at 103. This case, in the same way, meets the standards set out in both of these decisions. The property interest of each class member in the railroad right of way was taken without any compensation. The STB's action in issuing the NITU has affected each potential class member in the same manner. Each class member has been denied the right to enjoy his or her own property and use of the property for a period of time.

6. *Some of The Class Members' Claims are Fairly Small, Creating Doubt that Individual Claims Would be Pursued if Certification Denied.*

There is doubt that some individual claims would be pursued if certification is denied because some of the potential class members' claims and respective amounts in controversy are fairly small relative to the cost necessary to individually present these claims. According to *Armitage*, the application of this criterion may be framed as follows: "Is a class action the only viable way for most putative class members to bring their claim?" 18 Cl. Ct. at 313.

Many of the class members own small parcels of land that are traversed by the right of way in issue. Because the area of these smaller parcels is small, the attorney's fee and other costs of bringing the action for the individual claim would exceed the value of the claim. In *Hannon*, the court concluded that claims under one thousand dollars ($1,000) each were insufficient to encourage individual litigation. 31 Cl. Ct. at 103-104. *See also, Armitage*, 18 Cl. Ct. at 313 (estimate that the average claim of $500 to $1000 probably justifies class action). It is not feasible for many of these landowners to separately initiate litigation against the United States Government. Litigation costs would easily exceed the amount of individual owner's damages and, therefore, it is

doubtful that class members would pursue their individual claims. Consequently, a class action is the only vehicle by which many class members (especially the residential property owners) will be able to bring their respective claims.

7. *The Named Plaintiff Will Fairly and Adequately Protect the Interests of the Class Without a Conflict of Interest.*

The named Plaintiff will fairly and adequately protect the interests of the class. In order to satisfy this criterion, a plaintiff must demonstrate that the counsel for the class is adequate and that the named Plaintiff does not have any conflicts of interest with class members. According to *Quinault*, "counsel must be qualified, experienced, and generally able to conduct the proposed litigation" in order for this criterion to be satisfied. 453 F.2d at 1276 (*quoting Eisen*, 391 F.2d at 562). Additionally, there must be no significant conflicts between the named Plaintiff and the potential class members. *Saunooke*, 8 Cl. Ct. at 333.

i) *The Plaintiff Is Represented by Experienced Counsel*

The named Plaintiff is represented by experienced and highly skilled counsel who meets the standard set by *Quinault*. The Plaintiff's lead counsel, Mark F. (Thor) Hearne, II, is a member and principal with the law firm of Lathrop & Gage, L.C. Mr. Hearne has more than twenty years of experience in real estate, land use regulation, and related federal and state litigation. Mr. Hearne is admitted to practice before the United States Supreme Court, the Supreme Courts of Michigan and Missouri and the United States Courts of Appeals for the Eighth, Seventh, Sixth, and Second Circuits and in the Court of Appeals for the Federal Circuit. Mr. Hearne has received an "AV" rating from Martindale-Hubbell and has been selected as a Missouri/Kansas "Superlawyer" for 2005,

2006, and 2007 and was named one of Missouri's "Top Lawyers" by the *Missouri Lawyer Weekly*. Mr. Hearne has represented clients in numerous federal civil rights litigation involving constitutional (including Fifth Amendment) claims. Mr. Hearne has testified concerning constitutional and civil rights matters before committees of the United States Senate, United States House of Representatives and various other federal agencies including the United States Commission on Civil Rights.

Further, and of particular relevance to this action, Mr. Hearne has extensive experience practicing before this Court representing property owners in Trails Act takings cases. Mr. Hearne has represented (or is currently representing) property owners in nine Trails Act taking cases (*Rogers v. U.S.*, *Bay Plaza, LLC v. U.S.*, *Ladd v. U.S.*, *Birdbay Executive Golf Course v. U.S.*, *Pankratz v. U.S.*, *Biery v. U.S.*, *Illig v. U.S.*, *Miller v. U.S.*, and *The Town of Grantwood Village v. U.S*). Two of these cases, *Miller* and *Illig* were certified as class actions in this Court and each included claims by approximately 100 landowners. *Rogers* is currently pending in this Court as a certified class action and includes over 330 landowners. In addition, motions for class certification are currently pending before this Court in *Ladd* and *Pankratz*. Also common to this case are issues of Missouri and Kansas law that Mr. Hearne has successfully litigated (or is currently litigating) in *Miller v. United States*, *Grantwood Village v. United States*, *Biery v. United States*, and *Pankratz v. United States*.

At the conclusion of *Miller v. U.S.*, Judge Bruggink wrote of Mr. Hearne and his co-counsel, "Counsel, moreover, did an excellent job throughout the litigation." *Miller v. United States*, No. 03-2489L, Order approving class settlement in excess of $8.15 Million and awarding attorney fees and costs. (Docket No. 124, November 17, 2006 at 4).

Mr. Hearne is a member and principal of the Lathrop & Gage L.C. law firm, a law firm with approximately 300 attorneys, many with extensive real estate experience, especially experience with the unique issues of real estate law related to railroad land title in Missouri and Kansas. Lathrop and Gage maintains offices in Missouri, Kansas, and Washington D.C. among other locations. The Firm maintains the largest law office in Springfield, Missouri, which is very close to Jasper and Cherokee Counties. Lathrop and Gage also maintains an office in Washington, D.C. just blocks from this Court and the Firm's attorneys routinely handles cases in both this Court as well as the Court of Appeals for the Federal Circuit.

Mr. Hearne's firm possesses the financial and personnel resources necessary to represent the interests of the Plaintiff and the class in this case.

ii) *These Potential Class Members Have No Conflict of Interest*

There is no conflict of interest between the named Plaintiff and the potential class members. In *Saunooke*, the court held that this factor was not satisfied when the named Plaintiffs sought to litigate legal issues peculiar to only themselves, with no consideration to potential issues that could be raised by other members of the proposed class. 8 Cl. Ct. at 333.

The Supreme Court's denial of class certification in *Amchem Products, Inc. v. Windsor* is instructive as to what constitutes a conflict between class representatives and the class members. 117 S.Ct. 2231 (1997). In that case, the Court held that representatives must possess the same interest and suffer the same injury as the class members. *Id.* at 2250-2251, quoting *East Texas Motor Freight System, Inc. v. Rodriguez*,

431 U.S. 395, 403 (1977) quoting *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 216 (1974). The conflict in *Amchem Products* existed because class members already suffering from asbestos diseases had an interest in seeking the maximum immediate payments, thereby diminishing funds available to class members who were exposed to asbestos but who had not yet suffered any malady, and might not for years or even decades. *Id.* at 2251.

All damage that could possibly be done to each class member in this case has already occurred; no further damages could happen to one member thereby creating a separate cause of action for that class member, as was the case in *Amchem Products*. The named Plaintiff here seeks the same objective as the other class members—to recover "just compensation" the appropriate award for property taken from them by the U.S. Government.

Because the named Plaintiff is represented by skilled counsel and does not have any conflicts of interest with prospective class members, the seventh *Quinault* criterion is satisfied.

**D. CLASS CERTIFICATION IS THE MOST EFFICIENT WAY TO PROCEED IN THIS CASE, AND AS SUCH, SERVES THE INTERESTS OF JUSTICE.**

The number of potential plaintiffs in this case will likely exceed 75 similarly situated fee owners along the right of way between Cherokee County, Kansas and Jasper County, Missouri. The judicial efficiency of avoiding a scenario where hundreds of individuals either seek to join a lawsuit or initiate their own suits weighs heavy in favor class certification.

The Plaintiff is taking advantage of the opt-in procedure for determining the composition of the class which comports with this court's limited equitable jurisdiction. *Favreau, II*, 48 Fed. Cl. at 780. For these reasons, Plaintiff asserts that the interests of justice will be greatly served in this case.

### E. CLASS CERTIFICATION HAS BEEN GRANTED IN OTHER TRAILS ACT CASES BY THIS COURT.

Numerous other class action suits involving takings claims under the Fifth Amendment related to the Trails Act have been certified in this Court. *See*, *Rogers v. U.S.* (No. 07-273); *Miller v. U.S.* (No. 03-2489); *Hubbert v. U.S.* (No. 99-396L); *Illig v. U.S.* (No. 98-934L); *Moore v. U. S.* (No. 93-134L); and, *Glosemeyer v. U.S.* (93-126L). In *Moore*, this Court discussed class certification and granted plaintiffs' request thereof notwithstanding the presumption that "class actions are generally disfavored in [the Court of Federal Claims]." 41 Fed. Cl. at 397. Similarly in *Miller* and *Illig*.

## V. CONCLUSION

In *Quinault*, this Court stated that "[t]here is no reason why this court cannot use [class action lawsuits] if [they are] appropriate." *Quinault*, 453 F.2d at 1274. As this Memorandum demonstrates, Plaintiff's case is particularly well-suited to class action certification: (1) judicial economy and efficiency warrant it and the interests of justice would be served by it; (2) the complete satisfaction of the *Quinault* criteria all but mandate that class certification be granted; and, (3) the common issue of Kansas and Missouri real property law and the factual events and transactions by which the railroad's interest in the property is defined predominate and override any individual factual issues.

For all of the foregoing reasons, RCFC 23 warrants that this case be certified as a class action.

Respectfully submitted,

LATHROP & GAGE, L.C.

Date: June 18, 2008

By: /s/ Mark F. (Thor) Hearne, II

MARK F. (THOR) HEARNE, II
LINDSAY S.C. BRINTON
MEGHAN S. LARGENT
The Equitable Building
10 South Broadway, Suite 1300
St. Louis, MO 63102-1708
Telephone: (314) 613-2500
Facsimile: (314) 613-2550
(Mailing Address)

1845 S. National
P.O. Box 4288
Springfield, MO 65804
Telephone: (417) 886-2000
Facsimile: (417) 886-9126

Franklin Square, Suite 1050 East
1300 Eye Street, NW
Washington, D.C. 20005
Telephone: (202) 962-0032
Facsimile: (202) 962-0357

Attorney for Plaintiff