# In the United States Court of Federal Claims

No. 08-431L
(Filed February 24, 2009)

```
* * * * * * * * * * * * * * * * * * * * *    *
                                            *
EARLEEN FAUVERGUE et al.,                   *   Takings; Rails to Trails Act, 16
                                            *   U.S.C. §§ 1241-1251 (2000);
              Plaintiffs,                   *   statute of limitations, 28 U.S.C.
                                            *   § 2501 (2000); motion to certify
       v.                                   *   class action under; RCFC 23;
                                            *   RCFC 54(b) entry of judgment
THE UNITED STATES,                          *   upon finding of no just reason
                                            *   for delay.
              Defendant.                    *
                                            *
* * * * * * * * * * * * * * * * * * * * *    *
```

Mark F. (Thor) Hearne, II, St. Louis, MO, for plaintiffs.  Lindsay S.C. Brinton and Meghan S. Largent, Lathrop & Gage, L.C., of counsel.

Kristine S. Tardiff, Concord, NH, with whom was Acting Assistant Attorney General John C. Cruden, for defendant.  Elizabeth Nicholas, Environment & Natural Resources Division, Washington, DC, of counsel.

## MEMORANDUM OPINION AND ORDER

**MILLER,** Judge.

After argument on a contested motion to certify a class action under RCFC 23 for a taking of property under the Rails to Trails Act, 16 U.S.C. §§ 1241-1251 (2000), this case presents a relatively new issue in applying the United States Supreme Court's 2008 decision demarcating as jurisdictional the United States Court of Federal Claims' statute of limitations, 28 U.S.C. § 2501 (2000).  The issue is whether putative class members are allowed to opt in after the six-year statute of limitations has expired, when the class-action complaint was filed before the expiration as to one plaintiff and was amended after expiration to add other plaintiffs as putative class members.

**FACTS**

The class-action complaint originally filed on June 12, 2008, recites that on June 21, 2002, Earleen Fauvergue and unnamed putative class members ("plaintiffs") 1/ were landowners along the former Memphis Carthage & Northwestern Railroad Company (the "MCNRC") railroad line stretching from Jasper County, Missouri, to Cherokee County, Kansas (the "line"). The line was subject to a Notice of Interim Trail Use or Abandonment (the "NITU") published on June 21, 2002, and had since been turned into a public hiking trail.

The Rails to Trails Act, 16 U.S.C §§ 1241-1251 (2000) (the "Trails Act"), was enacted in the early 1980's to promote the conversion of abandoned railroad lines to recreational trails. Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 5 (1990). In general terms, once a railroad abandons use of its track, the fee owners of the burdened estate automatically gain their reversionary interest in the easement. The aegis behind the Trails Act is exploitation of railroad property interests by granting easements to third parties for alternative uses of the land where railroad tracks previously traversed. The Trails Act preserves the railroad's right-of-way by affording a State, municipality, or private group an opportunity (1) to negotiate with a railroad (2) to assume temporary managerial responsibility (3) to implement an interim use of the land (4) to build recreational trails. See Presault, 494 U.S. at 6-8. If an agreement is reached, the interim trail use "shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d) (2000). This process has been termed "railbanking." Caldwell v. United States, 391 F.3d 1226, 1229 (Fed. Cir. 2004), reh'g en banc denied, cert. denied, 546 U.S. 826 (2005).

The railbanking process typically starts when a railroad files an application, or other documentation, with the Surface Transportation Board (the "STB") stating its intention to abandon part of a line. The STB then publishes a notice of exemption in the Federal Register. To avoid abandonment of the track, and take advantage of the Trails Act, a state, municipality, or private group can file a railbanking petition with the STB. If the railbanking petition is sufficient, 2/ and the railroad agrees to negotiate, the STB issues a NITU, which

---

1/ Ms. Fauvergue filed the complaint in her name and in anticipation of class-action certification. Although Ms. Fauvergue was the only named plaintiff, the court refers to "plaintiffs" because the original complaint was filed as a class-action complaint.

2/ The railbanking petition must contain (1) a map of the right-of-way, (2) a statement indicating that the applicant will assume financial and legal liability of the right-of-way, and (3) an acknowledgment that the right-of-way may be reactivated for railroad use in the future. See Caldwell, 391 F.3d at 1229.

allows the railroad to salvage track and equipment, discontinue service, and prepare for the interim use without actually abandoning the railroad line. See generally Caldwell, 391 F.3d at 1229-32. If subsequent negotiations between the railroad and the applicant for interim trail use are successful, the NITU extends indefinitely; the STB retains jurisdiction for potential future railroad use; and the reversionary interests of the surrounding landowners, which would ordinarily vest upon abandonment of the rail line by the railroad, continue to remain dormant until actual abandonment. Id.

Most importantly to this motion, as held by the United States Court of Appeals for Federal Circuit in Caldwell, the NITU publication date is the date on which the statute of limitations, 28 U.S.C. § 2501, commences for all claims under the Trails Act. Caldwell, 391 F.3d at 1235 (holding that "the appropriate triggering event for any takings claim under the Trails Act occurs when the NITU is issued.").

In 1876 the MCNRC secured a 100-foot-plus wide strip of land, through condemnation decrees in Missouri and easements in Kansas, to construct railroad lines. The terms of the condemnation decrees included the automatic abandonment of the easements once MCNRC, or MCNRC's successor-in-interest, ceased operating a railroad across the right-of-way. 3/ The constructed line included a 28.25-mile-long stretch from Columbus, Kansas, in Cherokee County, to Carthage, Missouri, in Jasper County – the land at issue in this action.

The railroad easements remained in the MCNRC's name until 1980, when the easements were transferred to the St. Louis and San Francisco Railway Company, which, through a series of mergers, in 1995 became the Burlington Northern and Santa Fe Railway Company (the "BNSF"). The BNSF filed a Notice of Exemption with the STB to abandon the line on May 23, 2002, after two years of nonuse of the line.

Opportunistically, the city of Carl Junction, a municipality located on the Kansas/Missouri border, and the Joplin Trail Coalition (the "JTC"), a nonprofit organization in Missouri, jointly filed on May 10, 2002, a NITU for the Missouri portion of the line, approximately 15.93 miles long. Nineteen days later, on May 29, 2002, the JTC filed for a NITU for the Kansas portion of the line, covering a distance of 12.32 miles. The STB granted both NITUs on June 21, 2002. A trail-use negotiation period was established, and, following a series of 180-day extensions and reportedly acrimonious debates over the

---

3/ The proposed Second Amended Complaint, accompanying plaintiffs' motion to amend filed on October 31, 2008, elaborated that the condemnation decrees provided that the exclusive use and possessory property interests thereafter would revert to the fee owners.

implications of creating a trail, the JTC and BNSF reached a Trail Use Agreement on June 16, 2003. This agreement purported to transfer the BNSF's interests in the easement to the JTC. By letter dated October 20, 2003, the BNSF officially acknowledged that, as of October 31, 2003, it would discontinue use of the line. Moreover, on September 16, 2004, the BNSF entered into a quitclaim deed with the JTC to transfer all land along the line in Missouri.

The original complaint alleged that the trail development proceeded without the United States holding any proceedings to establish a new easement or condemnation decree and without the United States compensating, or offering to compensate, plaintiffs. Plaintiffs claim that the rail-to-trail conversion has deprived them of the value of the land now occupied by the trail and also has diminished the value of the adjoining property. Plaintiffs further assert that the taking violates their right to just compensation under the Fifth Amendment to the U.S. Constitution, specifically that the rail-to-trail conversion constituted a physical taking of property by the United States.

On June 12, 2008, plaintiffs filed their complaint in the Court of Federal Claims, and the case was assigned to Sr. Judge Loren A. Smith. On June 18, 2008, plaintiffs filed a motion to certify a class. On August 15, 2008, plaintiffs moved for leave to file an amended complaint. On August 21, 2008, defendant filed its answer and response to plaintiffs' motion for leave to file an amended complaint and defendant's response to plaintiffs' motion for class certification. Also on August 21, 2008, plaintiffs filed their reply brief on the motion seeking leave to amend.

On September 12, 2008, before Sr. Judge Smith had ruled on the motion to amend – the same day this case was transferred to the undersigned – plaintiffs inexplicably filed their First Amended Complaint. On September 18, 2008, defendant moved to strike plaintiffs' amended complaint. By order entered on October 3, 2008, this court granted defendant's motion to strike plaintiffs' First Amended Complaint. Plaintiffs were directed to file by October 17, 2008, a motion to file a second amended complaint, with defendant to respond by October 31, 2008; plaintiffs to reply by November 10, 2008; and defendant to file a sur-reply by November 20, 2008. On December 11, 2008, this court granted plaintiffs' motion to amend the complaint, see Fauvergue v. United States, 85 Fed. Cl. 50 (2008), and plaintiffs' Second Amended Complaint was filed that date. By separate order, also entered on December 11, 2008, this court ordered supplemental briefing to address the statute of limitations arguments in two other cases that, although fully briefed, were under consideration before another judge: Askins v. United States, No. 07-650L (Fed. Cl. Sept. 5, 2007), and Abarnathy v. United States, No. 07-651L (Fed. Cl. Sept. 5, 2007). By order dated December 19, 2008, this court set argument on the issue of class-action certification for

January 27, 2009.  The parties timely filed supplemental briefs, and argument was held as scheduled.

## DISCUSSION

I.  <u>The scope of protection afforded by 28 U.S.C. § 2501 over putative class members of an opt-in class action under RCFC 23</u>

Plaintiffs filed a timely complaint on June 12, 2008, nine days before the expiration of the six-year statute of limitations prescribed by 28 U.S.C. § 2501.  Plaintiffs' complaint, filed by "Earleen Fauvergue, for Herself as Representative of a Class of Similarly Situated Persons," was filed as a class-action complaint and purports to be filed on behalf of "all those similarly situated land owners that own land abutting or underlying [the railroad line]." Compl. filed June 12, 2008, at 3.  On June 18, 2008, six days after filing the complaint, plaintiffs filed their motion for class-action certification.  Plaintiffs estimated the eventual class size in their motion for class certification and presented arguments supporting certification of the general class of plaintiffs affected by the NITU published on June 21, 2002.

The six-year limitations period expired on June 21, 2008; the motion to certify class certification had not been fully briefed; no plaintiff other than Earleen Fauvergue, the sole named plaintiff at that time, had opted into plaintiffs' class action.  Plaintiffs moved to amend their complaint, on September 12, 2008, which included the addition of fifteen newly named party plaintiffs.  On December 11, 2008, this court granted plaintiffs' motion to amend the complaint with the caveat that the newly named parties would be added provisionally to the complaint and would be potentially vulnerable to a subsequent motion to dismiss filed by defendant.  <u>See</u> 85 Fed. Cl. at 50.  Defendant has moved to dismiss the newly named party plaintiffs and all putative class members who failed to opt in before the six-year statute of limitations imposed by 28 U.S.C. § 2501 expired on June 21, 2008.

Defendant's motion is premised on the legal proposition that filing a timely class-action complaint under RCFC 23 satisfies the statute of limitations only for named party plaintiffs in that complaint.  Insofar as putative class members attempt to opt in and/or join as named party plaintiffs after the expiration of the six-year limitations period imposed by 28 U.S.C. § 2501.  Defendant takes the position that all putative class members are barred from joining the class action.  <u>4</u>/  Defendant espouses two arguments in support of its

_____

    <u>4</u>/ Defendant incorporates by reference its arguments in both <u>Askins v. United States</u>, No. 07-650L (Fed. Cl. motion to dismiss briefed Apr. 14, 2008); and <u>Abernathy v.</u>

position: (1) filing a class-action complaint under RCFC 23 does not satisfy the statute of limitations for putative class members, and (2) the applicable statute of limitations, 28 U.S.C. § 2501, is statutory in nature and unable to be extended by rule-making authority of the Court of Federal Claims.

> 1. Whether a class-action complaint under RCFC 23 satisfies 28 U.S.C. § 2501 for putative class members

Plaintiffs advocate that a timely class-action complaint commences a civil action for the one named plaintiff's specific claims and all similarly situated plaintiffs who comprise the putative class. Plaintiffs invoke the Supreme Court's treatment of tolling and class actions under Fed. R. Civ. P. 23 in the seminal cases of American Pipe and Construction Co. v. Utah, 414 U.S. 538 (1974); Crown Cork & Seal Co., Inc. v. Parker, 462 U.S. 345 (1983); and United Airlines v. McDonald, 432 U.S. 385 (1977), to support their contention that filing a class-action complaint under RCFC 23 satisfies 28 U.S.C. § 2501 for all putative class members.

Plaintiffs argue that filing a class-action complaint protects putative class members because, by definition, a class-action complaint provides notice to the Government of the entire putative class's claims. Plaintiffs insist that "[c]lass members who do not file suit while the class action is pending cannot be accused of sleeping on their rights," Pls.' Br. filed Nov. 10, 2008, at 13 (quoting Crown Cork, 462 U.S. at 352); that Fed. R. Civ. P. 23 encourages class members to rely on named parties; and that the class-action complaint "'"notifies the defendant not only of the substantive claims being brought against them, but also of the number and generic identities [of the putative class,]"'" id. (quoting Crown Cork, 462 U.S. at 353 (quoting Am. Pipe, 414 U.S. at 555)). Plaintiffs interpret American Pipe and its progeny as adopting the rule that filing a timely class-action complaint commences the action for all members of an opt-in class action under Fed. R. Civ. P. 23 and, hence, the Court of Federal Claims's companion RCFC 23.

---

4/ (Cont'd from page 5.)

United States, No. 07-651L (Fed. Cl. motion to dismiss briefed Feb. 22, 2008). Both cases, involving the same core legal issue, are pending before Judge Victor J. Wolski. Because of the potential significance that Askins and Abernathy could have on oral argument and disposition of the case at hand and because those motions would not be resolved before completion of the briefing schedule in this case, the court advised both parties to respond to the arguments on file in Askins and Abernathy.

Plaintiffs also ground their argument on policy. Plaintiffs posit that, if the court were to hold a class-action complaint under RCFC 23 not to incorporate the putative class, a class action filed in a federal district court could include the putative class, while the same complaint filed in the Court of Federal Claims would not provide jurisdiction over the identical putative class members. Plaintiffs observe that no precedential ruling in the 150-year history of the United States Court of Claims and its Article I successors holds that § 2501 requires putative class members affirmatively to act to opt in before the statute of limitations has run.

Defendant discounts the applicability of <u>American Pipe</u>, <u>Crown Cork</u>, and <u>United Airlines</u> because Fed. R. Civ. P. 23 requires opt-out class actions, in contrast to the opt-in class actions allowed under RCFC 23. According to defendant, the Supreme Court's holding was "squarely premised on the court's articulation of how an opt-out class functions and, importantly, how an opt-out class action differs from an opt-in class action." Def.'s Br. filed Jan. 9, 2009, at 3.

Because class actions under Fed. R. Civ. P. 23 are opt-out only, defendant regards them to be more predictable and "truly representative" actions than opt-in class actions under RCFC 23. Def.'s Br. filed Jan. 9, 2009, at 3. Defendant distinguishes opt-out class actions, "in which all persons encompassed by the class are included in the class action unless they [make an] affirmative act to 'opt-out' of the action," from opt-in class actions, in which class members must opt into the class. Def.'s Br. filed Oct. 31, 2008, at 14-15 (<u>citing</u> Fed. R. Civ. P. 23). Just as class members affirmatively must act to opt out of a class action under Fed. R. Civ. P. 23 – or otherwise be bound by the class-action judgment – defendant would require a class member in an opt-in class action to take affirmative action within the six-year limitations period prescribed by 28 U.S.C. § 2501 in order to participate in a judgment.

Plaintiffs make a compelling policy argument for including putative class members in a timely class-action complaint. Holding that a class-action complaint under RCFC 23 does not itself satisfy the statute of limitations could create a situation where one class-action complaint filed under Fed. R. Civ. P. 23 in a federal district court under the Little Tucker Act, 28 U.S.C. § 1346 (2000), <u>5/</u> would embrace the putative class members under the statute of limitations applicable to filings in federal district court, while the same class-action complaint filed under RCFC 23 in the Court of Federal Claims would not operate in the same manner.

_____

<u>5/</u> Claims under the Little Tucker Act must be for less than $10,000.00. Claims over $10,000.00 must be brought in the Court of Federal Claims. 28 U.S.C. § 1346(a)(2).

Resolution of the legal issue reconciling the impact of § 2501 on the Court of Federal Claims' opt-in class-action rule with the general rule that filing of a class-action complaint preserves the claim for all putative class members is informed by decisions of the United States Supreme Court and the Federal Circuit, binding precedent for the United States Court of Federal Claims. See Coltec Indus. v. United States, 454 F.3d 1340, 1353 (Fed. Cir. 2006) ("[T]he Court of Federal Claims is required to follow the precedent of the Supreme Court, [the United States Court of Appeals for the Federal Circuit], and . . . the [United States] Court of Claims." (citations omitted)); see also Weyerhauser v. United States, 92 F.3d 1148, 1151 (Fed. Cir. 1996).  Binding precedent may not have contemplated plaintiffs' policy argument, but it does chart a legal analysis that dictates the result in this case.

Quoting American Pipe – and the Supreme Court decisions explicating and applying it – out of context, or without consideration of opt-in versus opt-out procedures, can lead to the inaccurate assumption that these holdings are applicable to all class actions.  See, e.g., Crown Cork, 462 U.S. at 353-54 ("We conclude, as did the Court in American Pipe, that 'the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.'") (quoting American Pipe, 414 U.S. at 554)). 6/  However, a straightforward reading of American Pipe illuminates the Supreme Court's holding as inextricably generated by the nature of opt-out class actions and provides insight into how the Supreme Court views the critical differences between opt-in and opt-out class actions.

American Pipe discussed the relationship between a class-action complaint and putative class members.  Before Fed. R. Civ. P. 23 was amended in 1966, opt-in class actions, also referred to as spurious class actions, could be maintained in federal court. American Pipe, 414 U.S. at 545.  The Supreme Court identified one weakness of the old rule as the absence of a method for determining  "any point in advance of final judgment which of those potential members of the class claimed in the complaint were actual members and would be bound by the judgment." Id. at 546.  As such, the Court negatively characterized the opt-in class action as "merely an invitation to joinder-an invitation to become a fellow traveler in the litigation, which might or might not be accepted." Id. (citation omitted).  The Court condemned the ability of putative opt-in class members to await developments at trial to determine whether participation would be advantageous as a "recurrent source of abuse." Id. at 547. The Court declared that the 1966 amendments, changing class actions to opt-out only, were designed, in part, "specifically to mend this perceived defect in the former Rule and to assure that members of the class would be identified before trial on the merits and

---

6/  Crown Cork quoted American Pipe in the context of Fed. R. Civ. P. 23, which by that date was an opt-out-only federal class-action rule.

would be bound by all subsequent orders and judgments." <u>Id.</u>  The Supreme Court in <u>American Pipe</u> praised the importance of establishing a class-size determination "as soon as practicable" as a major improvement under the new opt-out-only rule. <u>Id.</u> at 549.

American Pipe's holding supports defendant's argument that the difference between opt-in and opt-out class actions requires that the two be treated differently. The Supreme Court in <u>American Pipe</u>, by implication, made a similar distinction.  Significantly, the Court acknowledged that the question of when putative class members, under the old rule, were required to opt into a class-action had not been resolved. <u>Id.</u> at 550.  Because the opinion issued after the adoption of the new opt-out-only rule, the Supreme Court had no reason to reach that decision.  In fact, while qualifying the holding that "there remain no conceptual or practical obstacles in the path of holding that the filing of a timely class-action complaint commences the action for all members of the class as subsequently determined," the Court clarified that arguments to the contrary are "inconsistent with Rule 23 <u>as presently drafted</u>." <u>Id.</u> at 550 (emphasis added).

The emphasis and clarification provided by reference to Rule 23 "as presently drafted," in the context of the previous discussion of the old and new Rule 23, supports restriction of the holding as specific to new Fed. R. Civ. P. 23, an opt-out-only class-action rule.   Therefore, future clarifications of <u>American Pipe</u>, especially when making generalizations about class actions, must be read in the light of opt-out class actions only. <u>See</u> <u>Eisen v. Carlisle & Jacquelin</u>, 417 U.S. 156, 176 n.13 (1974) (explaining that <u>American Pipe</u> "established that commencement of a class action tolls the applicable statute of limitations as to all members of the class").

> ## 2.  <u>Whether the RCFC are statutory rules of procedure that can toll 28 U.S.C. § 2501 for putative class members opting into a class action under RCFC 23</u>

None of the putative class members opted into the class action before the six-year limitations period imposed by 28 U.S.C. § 2501 expired on June 21, 2008.  Plaintiffs maintain that, after a class is certified, members of the putative class henceforth are allowed to opt into the class, even if the statute of limitations has expired.  The theory of legal tolling, according to plaintiffs, permits putative class members to opt in.  Plaintiffs reason that the decisions in <u>American Pipe</u>, <u>Crown Cork</u>, and <u>United Airlines</u> stand for the principle that "tolling the statute of limitations [in those cases] was not [due to] any equitable consideration related to the individual putative class members," but that it was legal or statutory tolling to further "'the administration of justice in the federal courts.'"  Pls.' Br. filed Jan. 9, 2009, at 14 (<u>quoting</u> <u>American Pipe</u>, 414 U.S. at 544).

Defendant proffers a two-part response, both sponsoring a strict application of the Supreme Court's holding in <u>John R. Sand & Gravel Co. v. United States</u>, 128 S. Ct. 750 (2008). Defendant first asserts that any rule drawn from <u>American Pipe</u> and its progeny is inapplicable because of differences between the opt-out procedures mandated by Fed. R. Civ. P. 23 and the opt-in class actions allowed under RCFC 23. Defendant reads <u>John R. Sand & Gravel</u> to stand for the proposition that, despite equitable temptations that align with a plaintiff's cause, the Court of Federal Claims cannot toll – legally or equitably – or otherwise extend the six-year statute of limitations period established by 28 U.S.C. § 2501.

Second, defendant notes that the Rules of the Court of Federal Claims are judge-made rules, which cannot expand or limit the statutory statute of limitations set forth by 28 U.S.C. § 2501 – a congressionally enacted statute. In <u>Stone Container Corp. v. United States</u>, 229 F.3d 1345, 1354 (Fed. Cir. 2000), the Federal Circuit recognized the difference between judge-made rules and statutory rules in the context of a rule adopted by another federal court. The tolling contemplated by the court in <u>American Pipe</u> was statutory tolling, not judge-made or equitable tolling, because interpretation of Fed. R. Civ. P. 23, a rule promulgated by the Supreme Court and approved by Congress, has the same effect as "any federal statute." Def.'s Br. filed Jan. 9, 2009, at 6 (quoting <u>Stone Container</u>, 229 F.3d at 1354). Unlike the statutory tolling in <u>American Pipe</u>, defendant observes that the Rules of the Court of Federal Claims, are not transmitted to Congress for approval.

Defendant maintains that, because the Rules of the Court of Federal Claims are not statutory, RCFC 23 cannot be applied in a manner that enlarges or limits the statute of limitations established by 28 U.S.C. § 2501. Defendant cites <u>Durr v. Nicholson</u>, 400 F.3d 1375, 1382-83 (Fed. Cir. 2005), a case characterizing the United States Court of Veteran Appeals procedural rules as "not jurisdictional" and therefore not "hav[ing] the status of a congressional statute," or "extend[ing] or limit[ing] the jurisdiction of the Court as established by law." Def.'s Br. filed Jan. 9, 2009, at 7 (quoting <u>Durr</u>, 400 F.3d at 1382-83 (citations omitted)). Drawing a direct parallel between the court rules in <u>Durr</u> and a rule adopted by the Court of Federal Claims, defendant warns that <u>Durr</u> stands for the proposition that the Court of Federal Claims cannot interpret RCFC 23, or any other judge-made rule not approved by Congress, to limit or extend the congressionally approved jurisdictional limits prescribed in 28 U.S.C. § 2501.

--------

Plaintiffs would limit the precise holding of <u>John R. Sand & Gravel</u> to teach that § 2501 is a jurisdictional statute of limitations and therefore not waivable and that a court *sua sponte* can raise the issue of timeliness of filing, even after the Government has waived the defense. Moreover, plaintiffs would distinguish <u>John R. Sand & Gravel</u> on the grounds that it was not a class-action lawsuit; that it never mentions <u>American Pipe</u>, <u>Crown Cork</u>, or

United Airlines, and does not purport to overrule those cases; 7/ that the facts in John R. Sand & Gravel do not involve a class-action complaint filed before the statute of limitations period expired; and that the John R. Sand & Gravel decision, if applicable to tolling, was only applicable to equitable tolling and does not extend to legal or statutory tolling, at issue in this case and in American Pipe, Crown Cork, and United Airlines.  Plaintiffs characterize defendant's reading of John R. Sand & Gravel as "contrary to the written opinion" and charge that defendant is "seek[ing] to apply the holding in a manner contrary to the opinion of the Federal Circuit in Stone Container." Pls.' Br. filed Jan. 9, 2009, at 14.

Although plaintiffs validly distinguish John R. Sand & Gravel, they neglect to acknowledge its impact on § 2501.  Plaintiffs correctly observe that John R. Sand & Gravel was not a class action; did not discuss the Supreme Court's decisions on the tolling effect of opt-in class-action complaints, and did not involve a class-action complaint filed before the statute of limitations period has expired, but the Supreme Court's decision in John R. Sand & Gravel reaches beyond the narrow scope of equitable tolling.  Indeed, John R. Sand & Gravel rigidly proscribes any tolling of § 2501.

It is not the holding that directs the result in this case as much as the Supreme Court's characterization of § 2501 in John R. Sand & Gravel that provides context for how the Supreme Court intended courts to apply § 2501.  The first paragraph of John R. Sand & Gravel concisely states, "We hold that the special statute of limitations governing the Court of Federal Claims requires [] *sua sponte* consideration." 128 S. Ct. at 752.  Support for its holding is meticulously detailed in the Court's distinction between statutes of limitation intended "primarily to protect defendants against stale or unduly delayed claims" versus other statutes of limitations that "seek not so much to protect a defendant[] . . . as to achieve a broader system-related goal, such as . . . limiting the scope of a governmental waiver of sovereign immunity."  Id. at 753 (citations omitted).  The Court categorized § 2501 as the latter type of statute of limitations – commonly referred to as "jurisdictional" – and described as a "more absolute" limitations period.  Id. at 753.

The Supreme Court explicated the holdings from several cases, the earliest from 1883, to emphasize the rigidity and absolute nature of the six-year statute of limitations imposed by § 2501.  In Kendall v. United States, 107 U.S. 123, 124-125 (1883), the Court rejected a plaintiff's plea for equitable tolling of the current six-year statute of limitations because he

---

7/  Plaintiffs also argue that John R.Sand & Gravel did not  overturn American Pipe and its progeny because American Pipe never was mentioned in the opinion, and "[c]ourts do not normally overturn a long line of earlier cases without mentioning the matter."  Pls.' Br. filed Jan. 9, 2009, at 12 n. 26 (quoting John R. Sand & Gravel, 128 S. Ct. at 756).

was unable to sue until Congress lifted a legal disability preventing him from filing suit. The Court did not permit tolling, and the John R. Sand & Gravel Court notably pointed out that the denial was "not because [the Kendall Court] thought the equities ran against the plaintiff, but because the statute (with certain listed exceptions) did not permit tolling." John R. Sand & Gravel, 128 S. Ct. at 754.

Next, the Court revisited the holding in Finn v. United States, 123 U.S. 227 (1887). The focus was on Finn's articulation that, unlike normal courts, a defendant is not required to first plead a statute of limitations defense in the Court of Federal Claims for the court to find a violation because of the "more absolute nature" of the court's statute of limitations. Id. at 754.

The Supreme Court in John R. Sand & Gravel also noted that the holding in Soriano v. United States, 352 U.S. 270 (1957), demonstrates that the statute of limitation's meaning had not changed despite several minor amendments. John R. Sand & Gravel, 128 S. Ct. at 755 (citing Soriano, 352 U.S. 273-74 (as case arising after several revisions to statute of limitations applicable to court's predecessor, the United States Court of Claims). Soriano cited Kendall and restated that the Court of Claim's statute of limitations is "jurisdictional" and not susceptible to tolling. Soriano, 352 U.S. at 273-74, (citing Kendall, 107 U.S. at 125). In John R. Sand & Gravel, the Court manifested a definite unwillingness to permit tolling of § 2501 through any legal, equitable, or statutory doctrine, even when such tolling may be permissible under other statutes of limitation. It is in this posture, with a narrow holding and an extensive analysis of § 2501, that the prospective application of John R. Sand & Gravel was structured. Moreover, to the extent any confusion exists whether John R. Sand & Gravel applies beyond the context of its explicit holding, the Federal Circuit has provided definitive guidance.

Less than two months after John R. Sand & Gravel issued, the Federal Circuit cited that decision in Mola Development Corp. v. United States, 516 F.3d 1370, 1375 n.1, reh'g en banc denied (Fed. Cir. May 5, 2008). The Federal Circuit commented that "[t]he Supreme Court recently held that this limitations period is jurisdictional." 516 F.3d at 1375 n.1. The import of the court's statement in Mola is that the Federal Circuit does not restrict the holding to the proposition that a court sua sponte can consider § 2501.

The Federal Circuit issued Young v. United States, 529 F.3d 1380, reh'g denied (Fed. Cir. July 30, 2008), five months later. The plaintiff in Young sued the U.S. Army seeking back pay following an alleged wrongful discharge. At the trial level, prior to the Supreme Court's opinion in John R. Sand & Gravel, plaintiff had argued that, although the complaint was filed after § 2501's six-year statute of limitations, his situation warranted equitable tolling. 529 F.3d 1380. Still pre-John R. Sand & Gravel, the trial court found no basis for

equitable tolling, and the case was appealed to the Federal Circuit after <u>John R. Sand &amp; Gravel</u> was decided.

The Federal Circuit affirmed the trial court's decision not to toll § 2501 in <u>Young</u> and articulated at least one alternative holding from <u>John R. Sand &amp; Gravel</u>.  Bearing in mind that <u>John R. Sand &amp; Gravel</u> states, "We hold that the special statute of limitations governing the Court of Federal Claims requires [] <u>sua sponte</u> consideration," 128 S. Ct. at 752, the Federal Circuit interpreted <u>John R. Sand &amp; Gravel</u> as "holding that the statute of limitations applicable to Tucker Act claims, 28 U.S.C. § 2501, is jurisdictional and not susceptible to equitable tolling." <u>Young</u>, 529 F.3d at 1384.  Plaintiff in <u>Young</u> persisted that categorizing § 2501 as "jurisdictional" does not bar § 2501 from being equitably tolled.  <u>Id.</u>  In a more probative response, the Federal Circuit again cited <u>John R. Sand &amp; Gravel</u> and stated:

> To the extent that [plaintiff] is seeking equitable tolling, such relief is foreclosed by <u>John R. Sand &amp; Gravel</u>, wherein the Court held that the Tucker Act's statute of limitations is in the "more absolute" category that cannot be waived or extended by equitable considerations. 128 S. Ct. at 753-54.

<u>Id.</u> at 1384.  The Federal Circuit's restating two variations of the holding in <u>John R.Sand &amp; Gravel</u> is informative.  One statement of the holding concluded:  "§ 2501, is jurisdictional and not susceptible to equitable tolling," while the other, of arguably broader scope, instructs that § 2501 "cannot be waived or extended by equitable considerations." <u>Young</u>, 529 F.3d at 1384. <u>8/</u>

<u>John R. Sand &amp; Gravel</u> ended any speculation about whether § 2501 can be extended through equitable tolling or equitable considerations.  Accepted as a derivative holding in <u>John R. Sand &amp; Gravel</u>, outside the narrow scope suggested by plaintiffs – that <u>John R. Sand &amp; Gravel</u> only holds that § 2501 can be challenged <em>sua sponte</em> – the Federal Circuit has foreclosed plaintiffs' argument.  Plaintiffs' alternate position is that, even if <u>John R. Sand &amp; Gravel</u> forbids equitable tolling of § 2501, the doctrine of statutory tolling, as espoused in <u>Stone Container</u>, allows putative class members to opt in after § 2501 expires.

Statutory tolling is a concept used to resolve conflicts between two statutes.  The Federal Circuit classified the tolling in <u>American Pipe</u>, <u>Crown Cork</u>, and <u>Stone Container</u> as "statutory tolling." <u>Stone Container</u>, 229 F.3d at 1354 (stating that "<u>American Pipe</u> and

---

<u>8/</u>  More recently, in <u>SKF USA, Inc. v. United States</u>, __ F.3d __, 2009 WL 398263 (Fed. Cir. Feb. 19, 2009), the Federal Circuit again cited <u>John R. Sand &amp; Gravel</u> in characterizing 28 U.S.C. § 2501 as jurisdictional.

Crown Cork . . . were not based on judge-made equitable tolling, but rather on the Court's interpretation of Rule 23."). Statutory tolling was permissible in American Pipe and Crown Cork because a contrary approach would "frustrate the principal function of a class suit." Id. The lynchpin of finding statutory tolling in both American Pipe and Crown Cork was the legal status of Fed. R. Civ. P. 23, which, as a rule approved by Congress, is "as binding as any federal statute." Id. Because they are statutory rules, "'[a]ll laws in conflict with [the Federal Rules of Civil Procedure] shall be of no further force or effect after such rules have taken effect.'" Id. (quoting 28 U.S.C. §2072(b) (2000)). Whereas American Pipe and Crown Cork addressed conflict between Fed. R. Civ. P. 23 and the applicable statutes of limitations, 9/ Stone Container involved Rule 23 of the Court of International Trade. The Federal Circuit pointedly observed that a judge-made or non-statutory rule, such as 28 U.S.C. § 2636(i) (2000), in Stone Container, does not require the same Congressional approval as the Federal Rules of Civil Procedure. Id.

The Federal Circuit in Stone Container immediately identified the distinction between the statutory Federal Rules of Civil Procedure and the non-statutory Rule 23 of the Court of International Trade. Id. at 1354. While implying that this difference would prove fatal to a statutory tolling argument, the court nevertheless found "no basis for distinguishing" between Rule 23 of the Court of International Trade and Fed. R. Civ. P. 23. Id. Because the statute of limitations at issue in Stone Container facially incorporated the procedural rules of the Court of International Trade, those rules were elevated to statute-strength. 10/ Id. Thus, the court held that Rule 23 of the Court of International Trade was statutory and not equitable and therefore had the same status as the rules addressed in American Pipe. Id.

Plaintiffs in the case at bar insist that Rule 23 of the Rules of the Court of Federal Claims is parallel to Rule 23 of the Court of International Trade. However, putative class members are not able to use statutory tolling to allow them to opt into a class action filed under RCFC 23 after 28 U.S.C. § 2501 expires because of two significant differences from American Pipe, Crown Cork, and Stone Container. First, RCFC 23 is not statutory and is not incorporated by reference in 28 U.S.C. § 2501. Second, 28 U.S.C. § 2501 has been defined by the Supreme Court, most recently in John R. Sand & Gravel, as being jurisdictional in nature and more absolute and rigid than other statutes of limitation, whereas the statutes of

---

9/ American Pipe was governed by 15 U.S.C. § 16(b) (2000), and § 706(f)(1) of the Civil Rights Act, 42 U.S.C. § 2000e-5(f) (2000), was invoked in Crown Cork.

10/ 28 U.S.C. § 2636(i) provides that an action is barred "unless commenced in accordance with the rules of the court within two years after the cause of action first accrues."

limitation in <u>American Pipe</u>, <u>Crown Cork</u>, and <u>Stone Container</u> have not been characterized in that manner.

The Rules of the Court of Federal Claims are procedural rules adopted by the court and cannot extend or limit the jurisdiction of the Court of Federal Claims.  <u>See</u> <u>Durr</u>, 400 F.3d at 1382-83 (refusing to allow Veterans' Court to force, through its procedural rules, inclusion of an address in filings as a jurisdictional requirement.).  Much like the Veterans' Court in <u>Durr</u> and the Court of International Trade in <u>Stone Container</u>, the Court of Federal Claims is enabled by statute to make rules, but the rules are not transmitted to Congress.  However, unlike <u>Stone Container</u> and like <u>Durr</u>, the statute of limitations applicable to the Court of Federal Claims does not incorporate any rules of the court into the statute.  There is no statute to statutorily toll.

Putative members of an opt-in class action in the Court of Federal Claims must opt in before the expiration of 28 U.S.C. § 2501.  Putative members attempting to opt in after the expiration of 28 U.S.C. § 2501 cannot take advantage of the statutory tolling enjoyed by class members opting out in federal courts under Fed. R. Civ. P. 23.  <u>John R. Sand & Gravel</u> limits, or even abrogates, the ability of the Court of Federal Claims to use any rule of the court, equitable tool, or ameliorative doctrine to allow putative class members to opt in after the expiration of 28 U.S.C. § 2501.

The procedural rule-making power of this court is just that, procedural, and it not jurisdictional in nature.  Therefore, under <u>Stone Container</u> and <u>Durr</u>, the court cannot adopt a rule that expands or limits the jurisdiction established by a mandatory statutory statute of limitations such as 28 U.S.C. § 2501.

This court's analysis reaches a different conclusion than a recent opinion from the Court of Federal Claims.  In <u>Kandel v. United States</u>, 85 Fed. Cl. 437, 439 (Fed. Cl. 2009), Sr. Judge Smith held that, notwithstanding <u>John R. Sand & Gravel</u>, § 2501 could be tolled statutorily.  The facts underlying <u>Kandel</u> are distinguishable from this case.  Plaintiffs in <u>Kandel</u> had been members of a large putative plaintiff class 11/ in a previous class action suit before the Court of Federal Claims, <u>Archuleta v. United States</u>, No. 99-205C (Fed. Cl. Apr. 7, 1999).  <u>Archuleta</u> settled, but only for a select group of the large plaintiff class.  The remaining plaintiffs filed a new suit, <u>Solow v. United States</u>, No. 06-872C (Fed. Cl. Dec. 22,

---

11/ Plaintiffs in <u>Archuleta</u> were federal employees from every federal civilian agency who claim that the Government miscalculated the lump-sum payment distributed to them upon separating from service or entering the military on active duty by excluding certain forms of employee compensation from the payout amount.

2006).   The Government unsuccessfully moved to dismiss for lack of subject matter jurisdiction under the theories based on *res judicata*, laches, and the bar of the statute of limitations. 12/   Solow v. United States, 78 Fed. Cl. 86, 89-90 (Fed. Cl. 2007).  After John R. Sand & Gravel issued, the Government moved for reconsideration in the same suit now styled Kandel v. United States, again asserting plaintiffs had not established subject matter jurisdiction.  Sr. Judge Smith denied defendant's motion on the ground of equitable tolling, but granted defendant's motion to dismiss under the doctrine of statutory tolling.  See 85 Fed. Cl. at 439-40.

Kandel's interpretation of Stone Container, American Pipe, and Crown Cork is at variance with how this court reconciled the same cases with RCFC 23 and § 2501.  Kandel viewed the differences between RCFC 23 and FRCP 23 – specifically the differences between opt-in and opt-out class actions – as insignificant and stated that they "do not affect the analysis and outcome in this case."  Kandel, 85 Fed. Cl. at 440.  The crux of Kandel's reasoning is that not allowing tolling would create practical problems for the class members of an opt-in class action.  Id. at 5 (citing Sperling v. Hoffmann-La Roche, Inc., 24 F.3d 463, 467 (3d Cir. 1994).  This court agrees that not tolling § 2501 for putative class members who take action after the expiration of the six-year limitations period does defeat the fundamental tenants and efficiencies of class actions as they are presently structured in the Court of Federal Claims.  However, until otherwise dictated by the Federal Circuit or the Supreme Court, the impact of the binding precedent in Stone Container, American Pipe, and Crown Cork leads this court respectfully to come to the opposite conclusion as the Kandel court.  Binding precedent dictates that our Government's waiver of sovereign immunity – as delineated in § 2501 – is construed strictly and cannot be tolled equitably or statutorily  for members of an opt-in class action in the Court of Federal Claims.

A trial court offers an alternative ruling when its holding is subject to legal debate and the parties have briefed fully an issue that will advance the case's disposition should a reviewing court not sustain the judgment entered below.  This is such a case.  The application for class-action certification is ripe for decision, and the development of the case should not be stalled should the Federal Circuit reverse.

---

12/ Unlike the plaintiffs in this case, whose causes of actions all accrued on the same date on which the NITU was issued, plaintiffs in Kandel were subject to various commencement dates, as the statute ran once the individual became eligible for payment, which differed from plaintiff to plaintiff.  See 85 Fed. Cl. at 438.

II. <u>Standards for class certification under RCFC 23</u>

RCFC 23, rewritten and reissued on May 1, 2002, and amended July 1, 2004, and November 3, 2008, governs class actions in the Court of Federal Claims. Prior to revision in 2002, RCFC 23 stated that "[t]he court shall determine in each case whether a class action may be maintained and under what terms and conditions." Rule 23 of the United States Claims Court, 9 Cl. Ct. XXI, LI (eff. Nov. 1, 1985) ("the old rule"); <u>see also</u> <u>Curry v. United States</u>, 81 Fed. Cl. 328, 331 (2008). Because the statutory language of the old rule did not provide guidance on how courts should evaluate class-action certification, the court follows the multi-step analysis, substantially derived from the criteria set forth by the Court of Claims in the seminal case <u>Quinault Allottee Ass'n v. United States</u>, 453 F.2d 1272, 1276 (Ct. Cl. 1972).

<u>Quinault</u> created an eight-factor conjunctive test to guide the court in evaluating motions for class-action certification. <u>Quinault</u>, 453 F.2d at 1276. The <u>Quinault</u> factors required that: (i) the class must be large, but manageable; (ii) a question of law must be common to the whole class; (iii) the common question of law must predominate over any separate factual issues affecting individual class members; (iv) the claims of named plaintiffs must be typical of the class; (v) the United States must have acted on grounds generally applicable to the entire class; (vi) the claims of many class members must be so small that it is doubtful that they would otherwise be pursued; (vii) the current plaintiffs adequately and fairly must protect the interests of the class without conflicts of interest; and (viii) the prosecution of individual lawsuits must create a risk of inconsistent or varying adjudications. <u>Id.</u>; <u>Barnes v. United States</u>, 68 Fed. Cl. 492, 494 (2005). Because the Federal Circuit has appellate jurisdiction over all Tucker Act and Little Tucker Act decisions, <u>see</u> <i>supra</i> note 5, the eighth <u>Quinault</u> factor is not applicable. <u>Favreau, II v. United States</u>, 48 Fed. Cl. 774, 777 (2000) (<u>citing</u> <u>Christian v. United States</u>, 46 Fed. Cl. 793, 815 n.6 (2000)). Therefore, prior to the 2002 amendment of RCFC 23, the Court of Federal Claims applied the seven factors espoused by <u>Quinault</u> in deciding class certification motions.

RCFC 23 provides for four prerequisites for certification of a class action, and two factors to consider whether a class action can be maintained:

(a) Prerequisites [to a Class Action]. One or more members of a class may sue as representative parties on behalf of all members only if:
    (1) the class is so numerous that joinder of all members is impracticable;
    (2) there are questions of law or fact common to the class;
    (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable.  A class action may be maintained if RCFC 23(a) is satisfied and if:

(1) [not used];

(2) the United States has acted or refused to act on grounds generally applicable to the class; and

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by class members;

(C) [not used]; and

(D) the likely difficulties in managing a class action.

The requirements of RCFC 23(a) and (b) can be summarized neatly into five elements: (1) numerosity, (2) commonality, (3) typicality, (4) adequacy, and (5) superiority.  See Curry, 81 Fed. Cl. at 332 (citing Barnes, 68 Fed. Cl. at 494).  A moving party's failure to establish one factor is fatal to class certification.  See  Filosa v. United States, 70 Fed. Cl. 609, 615 (2006); Barnes, 68 Fed. Cl. at 494.  Plaintiffs bear the burden of establishing, by a preponderance of the evidence, that a class action can be certified and maintained under RCFC 23.  Filosa, 70 Fed. Cl. at 615; see also Amchem Prods. v. Windsor, 521 U.S. 591, 613-14 (1997) (affirming judgment of regional circuit denying class certification under Fed. R. Civ. P. 23 because class did not satisfy requirements of common-issue predominance and adequacy of representation).  13/

---

13/  The Committee Notes following RCFC 23 provide guidance for  reconciling RCFC 23 with the seven-step analysis promulgated by Quinault.  "[T]he court's rule adopts the criteria for certifying and maintaining a class action as set forth in Quinault Allottee Ass'n v. United States, 453 F.2d 1272 (Ct. Cl. 1972)."  RCFC 23, Rules Committee Notes to 2002 Revision.  However, to the extent that a direct conflict arises between Quinault and RCFC 23, RCFC 23 controls.  See RCFC 83(a), see also Barnes, 68 Fed. Cl. at 495.  The court in Barnes articulated the interplay between the application of RCFC 23 and Quinault stating that "[i]t remains to apply the requirements of RCFC 23, as properly amplified by Quinault, to the facts in [the] case."  68 Fed. Cl. at 495.

1. <u>Numerosity</u>

RCFC 23(a)(1) requires that a successful class be "so numerous that joinder of all members is impracticable[.]"  This court has used interpretations from Fed. R. Civ. P. 23 as guidance for defining the boundaries of the "numerosity requirement" under RCFC 23(a)(1). The ability to use joinder does not preclude certification.  The practicality of joinder "depends on the particular facts of each case and no arbitrary rules regarding the size of classes have been established by the courts." <u>Jaynes v. United States</u>, 69 Fed. Cl. 450, 454 (2006) (citation omitted).  "Impracticable does not mean impossible." <u>Id.</u> (citing <u>Robidius v. Celani</u>, 987 F.2d 931, 935 (2d Cir. 1993)).

This court's rule for joinder, RCFC 20(a), requires plaintiffs to "(A) [] assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action."  Because " 'same' in this regard does not mean 'similar[,]'" a class action with claims that are similar, but arise from a different transaction or occurrence, would not be able to join their claims.  <u>Filosa</u>, 70 Fed. Cl. at 616 (citing <u>Barnes</u>, 68 Fed. Cl. at 495) (citation omitted).  When joinder is possible, the court applies the factors listed above to determine if joinder is impracticable.

No specific formula or bright-line test determines numerosity when joinder is possible. The variables employed include, but are not limited to, the number of class members, the location of the members of the proposed class, the ability to identify members' names and addresses, the size of the claims, and the type of action.  <u>See generally</u> <u>King v. United States</u>, 84 Fed. Cl. 120 (2008) (recapitulating law as developed by Court of Federal Claims); <u>14/</u> <u>Jaynes</u>, 69 Fed. Cl. at 454.  Notwithstanding the class size, joinder is "considered more practicable when all member of the class are from the same geographic area." <u>Jaynes</u>, 69 Fed. Cl. at 454 (citations omitted).

The number of potential class members, while not necessarily determinative, is a major consideration when evaluating the practicality of joinder for the purposes of class-action certification.  <u>King</u>, 84 Fed. Cl. at 124 (citing <u>Stewart v. Abraham</u>, 275 F.3d 220, 226-27 (noting that no minimum number of plaintiffs needed to maintain class action, but, if named plaintiffs can establish class size greater than 40, Fed. R. Civ. P. 23 is satisfied). Although the Court of Federal Claims has found numerosity based on number alone, no minimum or maximum boundary to a successful class size has been set, and the court has not created a "magic number" number that, once overcome, raises a presumption that numerosity

_____

<u>14/</u> This court follows the analytical approach of Judge Emily C. Hewitt in <u>King</u>.

is satisfied.  See Land Grantors v. United States, 71 Fed. Cl. 614, 622 (2006) (holding that proposed class including more than 1,000 known plaintiffs "alone supports the numerosity requirement"); see also Jaynes, 69 Fed. Cl. at 454 (holding "the [c]ourt declines to formally adopt a 'presumption' approach to numerosity.").

Geographical distribution of class members can sometimes weigh against finding numerosity.  If "class members are both geographically proximate and easily identified and located by means of defendant's records, joinder is more likely practicable even in light of a large class population." Jaynes, 69 Fed. Cl. at 455.  The practical implications of class-member geographical distribution also require consideration of a number of the factors applicable to numerosity: the facility of serving process, the ease of identification, the ease of ascertaining addresses, and the distance between their residences are all fact-specific inquiries that influence the impracticality of joinder.  Id.

Another factor utilized in determining numerosity is whether the size of the individual claims is such that, alone, class members would be discouraged from pursuing their claim. King, 84 Fed. Cl. at 125.  Because the time and financial commitment involved in litigation can be outweighed by the potential recovery, forming a class action can be the only method of rendering what would otherwise be a nominal recovery more substantial and worthwhile. See Barnes, 68 Fed. Cl. at 499-500.

Plaintiffs in the case at bar describe the proposed class as encompassing over 150 potential class members who own land along the line, which was subject to the NITU on June 21, 2002, and has since been turned into a public hiking trail.  Defendant postulates that plaintiffs cannot meet the first prerequisite for class certification because the class is not "'so numerous that joinder of all members is impracticable.'"  Def.'s Br. filed Aug. 21, 2008, at 12 (quoting RCFC 23(a)(1)).  Defendant contrasts plaintiffs' potential class size to recent class actions certified by the Court of Federal Claims that have included between 5,000 and 10,000 class members.  See Barnes, 68 Fed. Cl. at 493-95 (5,000); Curry, 81 Fed. Cl. at 332 (10,000).

Moreover, defendant contends that the claims relating to the Kansas segment should be excluded from any estimate of the class size, because the Kansas segment of the line was not subject to railbanking and interim trail use.  Once the BNSF abandoned this portion of the line, the STB lacks regulatory jurisdiction over it, and the disposition of the lands is a matter of Kansas state law.  The only potential claims that landowners of the Kansas portion of the line may have are for temporary regulatory takings "based on the stay of the abandonment proceedings to allow BNSF and JTC to negotiate a railbanking and interim trail use agreement," Def.'s Br. filed Aug. 21, 2008, at 13, and none of these claims was filed during the six-year statute of limitations period applicable to such claims.

Plaintiffs retort that the issuance of the NITU was the "single trigger" that denied all potential class members their property rights to their land. Pls.' Br. filed Sept. 12, 2008, at 7. Plaintiffs add that defendant's position in this case is inconsistent with its position in similar cases currently before this court, such as <u>Ladd v. United States</u>, No. 07-271L (Fed. Cl. Apr. 30, 2007). In <u>Ladd</u> the Government addressed the differing claims – temporary and permanent takings – on summary judgment.

The issuance of a NITU is the "triggering event" for any takings claim under the Trails Act. <u>Caldwell v. United States</u>, 391 F.3d 1226, 1235 (Fed. Cir. 2004). "The NITU marks the 'finite start' to either temporary or permanent takings claims by halting abandonment and the vesting of state law reversionary interests when issued." <u>Id.</u> The only government action during the railbanking process is the issuance of the NITU because its issuance prevents abandonment, thus precluding state reversionary interests from vesting with abutting landowners. <u>Id.</u> at 1233-34. The NITU can trigger a process that results in a permanent taking, or, if negotiations fail, the NITU would convert to a notice of abandonment triggering a possible temporary taking. <u>Id.</u> at 1234.

Under the Fifth Amendment to the United States Constitution, private property shall not "be taken for public use without just compensation." U.S. Const. amend. V. In addition to taking property by physical occupation or invasion, a taking may occur where the Government regulates private property. <u>Lucas v. S.C. Coastal Council</u>, 505 U.S. 1003, 1017 (1992) (holding that categorical taking requires that regulatory imposition remove all economic value from property); <u>Penn Cent. Transp. Co. v. New York City</u>, 438 U.S. 104, 124, 130-31 (1978) (holding that regulatory taking requires analysis of parcel as a whole and establishing three factors for such determination, including economic impact of regulation on claimant, regulation's interference with investment-backed expectations, and character of governmental action). Limits are placed on the Government's regulation of private property flowing from the recognition that, if "subject to unbridled, uncompensated qualification under the police power, 'the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed].'" <u>Lucas</u>, 505 U.S. at 1014 (alterations in original) (citation omitted).

Assuming that a claim is ripe, the court must determine if the regulation goes "too far." <u>Lucas</u>, 505 U.S. at 1015 (citation omitted). This finding entails a "'two-tiered' inquiry into the government act alleged to have constituted a taking." <u>Chancellor Manor v. United States</u>, 331 F.3d 891, 901 (Fed. Cir. 2003).

First, the court must consider "the nature of the interest allegedly taken to determine whether a compensable property interest exists." <u>Chancellor</u>, 331 F.3d at 901; <u>M & J Coal Co. v. United States</u>, 47 F.3d 1148, 1154 (Fed. Cir. 1995) (analyzing whether "interest was

a 'stick in the bundle of property rights' acquired by the owner"). If plaintiffs are unable to prove that they held a protected property interest, their takings claim will fail. Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001) (holding that "only persons with a valid property interest at the time of the taking are entitled to compensation"). If plaintiffs succeed in meeting the first element, the court then must determine whether the Government's action "constitutes a compensable taking of that interest for a public purpose." Chancellor, 331 F.3d at 902; see also M & J Coal, 47 F.3d at 1154.

The NITU published on June 21, 2002, was the single triggering event giving rise to potential, temporary, or permanent takings claims. See Caldwell, 391 F.3d at 1234. Although the court's legal analysis pertaining to individual facts may vary, given the nature of the taking, the claims relating to the landowners in Kansas should not be excluded from the class. Moreover, at this juncture, a full adjudication of liability is not required before the court can determine whether the class certification requirements are satisfied. 15/ See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.").

Numerosity is a fact-specific analysis that should be evaluated on a case-by-case basis. Joinder in this case is impracticable, not impossible. See RCFC 20(a) (requiring right to relief must be asserted by plaintiffs arising out of same transaction or occurrence and have question of law or fact common to all parties). Plaintiffs have established that the proposed class size includes approximately 150 landowners that are dispersed along a 28.25-mile-long stretch across two states. An overarching common question of law unites the proposed class – regulatory land takings resulting from the Trails Act and the issuance of a single NITU – even if within the proposed class differing types of takings claims are present. Thus, joinder is not impossible, but impracticable, and a class action certainly is "superior to other available methods for fairly and efficiently adjudicating [this] controversy." RCFC 23(b)(3).

   2. Commonality

The commonality requirement encompasses three elements: (1) questions of law or fact are common to the class, RCFC 23(a)(2); (2) "the United States has acted or refused to act on grounds generally applicable to the class," RCFC 23(b)(2); and (3) "questions of law

---

   15/ Defendant states that plaintiffs included in their class estimate parties who have already filed takings claims involving the Missouri portion of the line. Plaintiffs directly challenge this assertion, stating that the 150-class-size estimate does not include any landowners who already have filed taking claims. See Pls.' Br. filed Sept. 21, 2008, at 14.

or fact common to class members predominate over any questions affecting only individual members," RCFC 23(b)(3).  See also King, 84 Fed. Cl. at 125.  The threshold in proving commonality is not high.  Id.  (citing Jenkins v. Raymark Indus., 782 F.2d 468, 472 (5th Cir. 1986) (interpreting Fed. R. Civ. P. 23)).  The commonality requirement serves two primary purposes: first, to ensure "proposed classes are sufficiently cohesive to warrant adjudication by representation"; and second, to prevent certification of a class that will "degenerat[e] into a series of individual trials." Barnes, 68 Fed. Cl. at 496 (citations omitted).

Commonality does not mean without difference. "[T]o meet [the standard of] RCFC 23(a)(2), the questions underlying the claims of the class merely must share essential characteristics, so that their resolution will advance the overall case." Id.  Commonalities between class members can be gleaned from pleadings and, if necessary, "relevant claims, defenses, facts and substantive law." King, 84 Fed. Cl. at 125 (quoting Barnes, 68 Fed. Cl. at 496 (citations omitted)).

### 1) Common questions of law or fact

RCFC 23(a)(2) requires that a class have "questions of law or fact common to the class." This requirement is satisfied when there is "at least 'one core common legal question[,]'" which, when resolved, will affect at least a significant number of class individuals.  King, 84 Fed. Cl. at 125-26 (quoting Fisher v. United States, 69 Fed. Cl. 193, 199 (2006)); see also Land Grantors, 71 Fed. Cl. at 623. These common questions of law or fact need not be identical, but must "share essential characteristics, so that their resolution will advance the overall case." Fisher, 69 Fed. Cl. at 199 (citing Barnes, 68 Fed. Cl. at 496).

Defendant's argument, predictably, hinges on the distinction between plaintiffs' claims for temporary and permanent takings.  Defendant asserts that Ms. Fauvergue alleges a permanent taking of her property in Missouri.  Conceding that the NITU issued on June 21, 2002, authorized railbanking negotiations in both states, defendant insists that the negotiations did not result into an agreement as to the Kansas segment of the line. Consequently, plaintiffs residing on the Kansas portion of the line have at best a claim for a temporary regulatory taking.

Plaintiffs respond that Ms. Fauvergue did not distinguish between permanent and temporary takings "as a basis upon which she is similarly situated with the other landowners whose property is subject to the same NITU." Pls.' Br. filed Sept. 12, 2008, at 9.  Plaintiffs also note that the type and merits of the takings claim are irrelevant on a motion for class certification.

23

As the Federal Circuit stated in <u>Caldwell</u>, "The issuance of the NITU is the <u>only government</u> action in the railbanking process . . . ." 391 F.3d at 1233 (emphasis added). Therefore, all the facts arising from, and incident to, this act (the issuance of the NITU) will be common to the class.  All plaintiffs, moreover, share one core common legal question: did a Fifth Amendment taking occur when the NITU issued on June 21, 2002, thereby blocking the landowners' reversionary interests in their land?  The resolution of the latter questions will affect all or a significant number of putative class members.  Common questions of fact and law apply to the entire putative class.

### 2) <u>Refusal to act on grounds generally applicable to the class</u>

RCFC 23(b)(2) requires that the United States must have "acted or refused to act on grounds generally applicable to the class."  Plaintiffs have alleged a Fifth Amendment taking of their reversionary interest in their land based on the issuance of the NITU on June 21, 2002.  The "act" is the issuance of the NITU, which is "generally applicable" to the class because it gave rise to potential takings claims for all putative class members.

### 3) <u>Common questions of law or fact predominate over individual questions</u>

Once the class is certified, RCFC 23(b)(3) requires that, to maintain the class, "questions of law or fact common to the members of the class predominate over any questions affecting only individual members."  Although this requirement is "far more demanding" than RCFC 23(a)(2), <u>Curry</u>, 81 Fed. Cl. at 334 (quoting <u>Amchem Prods.</u>, 521 U.S. at 624), "'factual variation among the class grievances' is acceptable as long as a 'common nucleus of operative fact' exists," <u>Curry</u>, 81 Fed. Cl. at 334 (citation omitted); <u>see also</u> <u>Barnes</u>, 68 Fed. Cl. at 496 (explaining that class-wide issue predominates when "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." (quotation marks omitted) (quoting <u>Moore v. Paine Webber, Inc.</u>, 306 F.3d 1247, 1252 (2d Cir. 2002))). Plaintiff-specific determinations required to calculate the eventual award are insufficient alone to defeat class certification.  <u>King</u>, 84 Fed. Cl. at 126 (<u>citing</u> <u>Curry</u>, 81 Fed. Cl. at 334).

The predominate question applicable to all putative plaintiffs is whether the Government committed a taking by blocking their reversionary interests in the property.  That plaintiffs may receive different awards of damages based on the nature of the takings claim does not displace the principal legal question or the core facts of this case.

Based on these reasons, plaintiffs have satisfied all three requirements for commonality.

24

3.  Typicality

RCFC 23(a)(3) provides that "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class."  As the court in Barnes observed: "[T]he analysis of commonality and typicality tends to merge because '[b]oth serve as guideposts for determining whether . . . the named plaintiff's claim and the class are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'"  68 Fed. Cl. at 498 (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 n. 13 (1982)).  "'[E]ven if some factual differences exist between the claims of the named representatives,'" plaintiffs can successfully establish typicality by showing that "'the named representatives' claims share the same essential characteristics as the claims of the class at large.'"  Curry, 81 Fed. Cl. at 335 (quoting Fisher, 69 Fed. Cl. at 200).  The threshold for plaintiffs to overcome is "also [like the commonality test] not high."  Fisher, 69 Fed. Cl. at 200.

Defendant presents the same arguments for both the commonality and typicality prerequisites.  Defendant emphasizes that the claims are not "typical" because, "[e]ven assuming arguendo that Fauvergue's individual claim could be considered typical of the claims of the landowners in Missouri . . . her claim is not typical of the claims of the landowners in Kansas . . . ." Def.'s Br. filed Aug. 21, 2008, at 16.  Plaintiffs maintain that the NITU issued on June 21, 2002, is the basis for all class members' takings claims.  Even if Ms. Fauvergue's claims in her original complaint were not representative of class members in Kansas, ten of the sixteen named plaintiffs added to the amended complaint were landowners in Kansas on June 21, 2002.

Plaintiffs have satisfied their burden in proving typicality under RCFC 23(a)(3).  The named representatives' claims share the same essential characteristics as the claims of the entire putative class: all plaintiffs' claims in the proposed class arose under the Trails Act when the same NITU was issued.

4.  Adequacy of representation

A certified class must be "fairly and adequately protect[ed]" by adequate counsel. RCFC 23(a)(4).  There are two steps to evaluate adequacy of representation; first, the court must consider whether the proposed class counsel is "qualified, experienced and generally able to conduct the litigation."  Curry, 82 Fed. Cl. at 336 (quoting Barnes, 68 Fed. Cl. at 499); see also King, 84 Fed. Cl. at 127.  Second, plaintiffs must also show that class members do not "have interests that are antagonistic to one another."  Curry, 82 Fed. Cl. at 336 (quoting Barnes, 68 Fed. Cl. at 499 (quotation omitted)).

Plaintiffs satisfy, and defendant does not challenge, the first criterion establishing adequacy.  Lead counsel in this case, Mark F. (Thor) Hearne, II, is an experienced litigator and has represented, or is representing, property owners in nine Trails Act takings cases pending in the Court of Federal Claims.  Two of the Trails Act cases currently are certified as class actions, and two have motions pending for class-action certification.  At the conclusion of one such Trails Act case before this court, Sr. Judge Eric G. Bruggink commented that Mr. Hearne and his co-counsel did an "excellent job throughout the litigation."  Miller v. United States,  No. 03-2489C, at 4 (Fed. Cl. Nov. 17, 2006) (order adopting parties' settlement proposal and entering final judgment).

Regarding the second criterion, defendant raises a conflict of interest, grounding its challenge on the "factual[] and legal[] distinct[ions]" presented by "any temporary claims that could be pursued by the Kansas landowners."  Def.'s Br. filed Aug. 21, 2008, at 22.  Defendant does not present any other arguments in support of its position.  Because plaintiffs have the same legal and factual claims, the court cannot divine from the facts of record how the adjudication of this case as a class action could affect adversely other potential class members.

### 5.  Superiority of a class action to other litigation-management approaches

The procedural tool of a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy."  RCFC 23(b)(3).  In both King and Curry, the Court of Federal Claims used a cost-benefit analysis, also applied in Barnes, "weighing foreseeable manageability or fairness problems against 'the benefits to the system and the individual members likely to be derived from maintaining such an action.'"  Curry, 81 Fed. Cl. at 337 (quoting Barnes, 68 Fed. Cl. at 499).  The court in King, also quoting Barnes, noted that "superiority can be met when 'a class action would achieve economics of time, effort, and expenses, and promote uniformity . . . without sacrificing fairness or bringing about other undesirable results.'"  King, 84 Fed. Cl. at 128 (quoting Barnes, 68 Fed. Cl. at 499).

Defendant argues that the numerous Trails Act cases that have come, and are pending, before the court demonstrate that a class action is not a necessary or superior means for resolving this case.  The number of actions is "conclusive[]" evidence that plaintiffs have an interest in controlling their claims as separate actions.  Def.'s Br. filed Aug. 21, 2008, at 20.  Defendant notes that 102 of the plaintiffs captured by the proposed class  already have filed separate takings claims in one of the four pending lawsuits.  Plaintiffs retort that none of the 150 putative class members currently has claims pending in the Court of Federal Claims.  Plaintiffs seek to proceed as a class as it is the superior method of adjudicating their claims.

Under a cost-benefit analysis, the pendulum tips comparatively in favor of class certification. Even considering the possible distinction of claims between temporary and permanent takings, defendant does not show that the court would have any difficulty in managing the proposed class. See Barnes, 68 Fed. Cl. at 500-01 (noting that there were no issues of managing a class size of approximately 5,000 Navy civilian employees for premium pay claims). In fact, litigating all putative class members' claims in one action will achieve economies of scale in time, effort, and expense because the court is dealing with common questions of law and fact, and plaintiffs during oral argument substantiated the uncertainty about whether the landowners with nominal claims would be able to file individually. See Transcript of Proceedings, Fauvergue v. United States, No. 08-431L, at 83 (Fed. Cl. Jan. 27, 2009). The court does not foresee a risk of sacrificing fairness, taking into account defendant's conjecture that the number of Trails Act cases filed in the Court of Federal Claims is evidence that plaintiffs prefer to file claims individually.

Plaintiffs have satisfied all four prerequisites for class certification and the two factors establishing that this class action can be maintained.

## CONCLUSION

Defendant's motion to dismiss for lack of subject matter jurisdiction is granted. Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. The Clerk of the Court shall dismiss the Second Amended Complaint without prejudice for lack of subject matter jurisdiction as to all named plaintiffs other than Earleen Fauvergue. Pursuant to RCFC 54(b), judgment shall be entered accordingly because the court has determined that there is no just reason for delay. Sound reasons justify an immediate appeal: (1) this court's holding presents a new application of the Supreme Court's ruling in John R. Sand & Gravel, and (2) resolving Ms. Fauvergue's case alone would waste the parties' resources if the case had to proceed anew as to the many dismissed plaintiffs. See ILOR, LLC v. Google, Inc., 550 F.3d 1067, 1072 (Fed. Cir. 2008) (adopting view that "bare recitation of 'no just reason for delay' standard of Rule 54(b) is not sufficient, by itself, to properly certify an issue for immediate appeal." (citation omitted)).

    2.   The parties shall file a Joint Status Report by March 27, 2009, proposing a schedule for further proceedings, unless the dismissed plaintiffs have filed an appeal.  The court will entertain a motion to stay proceedings as to Ms. Fauvergue pending such an appeal.


                    s/ Christine O.C. Miller

                _____
                **Christine Odell Cook Miller**
                Judge